**FIRST NAT. BANK OF KANSAS CITY**
**v. NEE.**
**No. 14248.**

United States Court of Appeals
Eighth Circuit.
June 7, 1951.

John H. McEvers, Kansas City, Mo. (Reece A. Gardner, G. Lee Burns and Stinson, Mag, Thomson, McEvers & Fiz-

zell, all of Kansas City, Mo., on the brief), for appellant.

Harry Marselli, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, A. F. Prescott and Louise Foster, Sp. Assts. to Atty. Gen., Sam M. Wear, U. S. Atty. and Sam O. Hargus, Asst. U. S. Atty., Kansas City, Mo., on the brief), for appellee.

Before COLLET and STONE, Circuit Judges, and DELEHANT, District Judge.

DELEHANT, District Judge.

The bank's appeal presents the question whether, under the facts, as either admitted or established, the bank in its temporary position as executor in possession was entitled in the determination of its income tax for the years 1940 and 1941 to deduct from gross income, depreciation on the value of an asserted interest in a building erected by the tenant under a long term lease and located on a parcel of real estate belonging to the estate of the decedent, who was lessor in the lease. The situation in which the controversy arose will now be recalled as briefly as seems appropriate.

Mrs. Lydia S. Williams, owner in fee simple of a then improved parcel of real estate located at 40th and Main Streets in Kansas City, Missouri, on July 31, 1934 entered as lessor into a written lease of the property for the term of ninety-nine years from September 1, 1934, with Fortieth & Main Corporation (a wholly owned subsidiary of Katz Drug Company) as lessee, for a cash bonus of $15,000.00, and at an agreed net annual rental payable in advance for the first year, and monthly thereafter, of $7,500.00 during the first three years of the term, $9,000.00 during the next five years, and $10,000.00 during the remainder of the term. The lessee was required to pay all taxes and charges against the premises, to make repairs and maintain insurance, all with the effect of assuring to the lessor and her successors an undiminished annual ground rental from the property (subject, of course, to income taxes) in the amounts successively prescribed, supra. The lease accorded to the lessee the right

to, and clearly contemplated that it would, raze the building then on the premises and erect thereon a new modern business building at a cost of not less than $50,000.00.

It was not contemplated by the lease that the structure initially to be erected on the land by the lessee in pursuance of it, which was so erected and, is still there, should necessarily remain on the premises throughout tht term of the lease. On the contrary, and with due safeguards for the protection by bond of the lessor's interests in the event of, and during, demolition and reconstruction, the lease provided that: "The lessee shall have the right to demolish and remove in whole or in part, any building or improvements now or hereafter erected on the leased premises, only for the purpose of remodeling, altering and/or repairing the same so as to be fireproof and as valuable as the building or buildings to be constructed by the lessee as herein provided, or to replace same with new fire proof buildings and improvements to be fortwith (sic) constructed herein provided for."

The lease contained ample provisions for the forfeiture of the lessee's interests in the event of its default. As security for the lessee's performance of its covenants it contained the following language:

SECURITY "All buildings and improvements hereafter located or erected on such premises at any time during the term of this lease, shall be and remain charged with a lien in favor of the lessor as security for the enforcement of all the covenants of this lease by the lessee to be kept and performed. Such lien shall be prior to all other contracts, liens, or other incumbrances whatsoever affecting the demised premises."

That provision was followed in the same paragraph by this sentence: "In case of forfeiture or termination of this lease on account of any default of the lessee, or at the end of the demised term of Ninety-nine (99) years, all buildings and improvements then on said premises, without compensation to the lessee, shall pass to and become the property of lessor, free of all liens and incumbrances."

And a somewhat related additional provision was included:

"SURRENDER AT END OF TERM: At the end of the term of this lease, lessee and the tenants and subtenants under lessee will surrender possession of the demised premises and all buildings and improvements thereon to lessor, of at least the value and maintained as herein provided for and free of and from any claims thereto by lessee."

Under the lease, the lessee punctually demolished the buildings on the property, and constructed on it a new and modern store building at a cost of approximately $147,000.00. It promptly subleased the premises with its improvements then under construction to its parent corporation, Katz Drug Company, for a defined term and at an ascending rental scale with an eventual maximum of $2,250.00 per month, the sublessee to pay for maintenance, repairs, insurance and general taxes on the entire premises. The prime lessee then assigned its interest under the Williams lease to another Katz corporate subsidiary, which, shortly thereafter, secured a lease from a stranger to this case on neighboring premises for use as a parking space obviously incident to the operations on the Williams property by Katz Drug Company, as sublessee. The situation thus resulting still obtains.

Mrs. Williams died testate on September 23, 1939. Her will designated the bank as her executor. The probate court seasonably appointed the bank to that office in which it promptly qualified. The will, among many presently irrelevant provisions, devised the leased premises to the bank as trustee for designated beneficiaries with comprehensive power of management.

On December 18, 1940 the bank, as executor, made and filed its final federal estate tax return for Mrs. Williams' estate. In it item 4 of Schedule A, alone had reference to the property under consideration. That item consisted of an exact description by metes and bounds of the real estate only and with no reference to any improvements upon it followed by the supporting statement: "Ground leased to Fortieth & Main Corp. for 99 years from 9–1–34 to 8–31–2033. $9,000 per annum from 9–1–37 to 8–31–42, thereafter $10,000 per annum, payable monthly. On May 26, 1938 the lease was assigned to Westport Investment Co." and by the further words:

"Appraised at.............$125,000.00". The tendered valuation was accepted by the federal estate taxing authorities and the estate's liability for federal estate tax was determined upon the basis of that value.

Meanwhile, pursuant to order of the probate court dated February 8, 1940, the bank as executor had taken possession of the estate's interest in the property for the purpose of collecting the rents therefrom to provide money for the payment of the estate's debts. In that relation and capacity for the years 1940 and 1941 it received income for which it was required to account and to pay a federal tax. For each year it seasonably made its income tax return, making therein no claim of any right to deduct from gross income anything in the way of depreciation on improvements on the leased property. The returns were audited in due course and adjustments were made which, for the two years, considered together, involved a slight additional tax, which the bank paid. The adjustments resulted in the determination of a deficiency in tax for one of the years and of an overpayment for the other year. In making the adjustments the taxing authorities did not give, and were not theretofore requested to give, credit for the depreciation now in litigation.

In due time the bank, as executor, filed claims for refund of taxes claimed wrongfully to have been assessed and paid for the two years, and based its claims upon the failure of the bank to demand, and of the taxing authorities to grant, for each of the years the item of depreciation now in controversy. The claims were disallowed. This suit was thereupon brought in proper time by the bank, as trustee, in which capacity it had theretofore succeeded to any right of recovery by the executor upon the final settlement of the Williams estate which had intervened.

At the time of Mrs. Williams' death the building then and now on the leased premises had a remaining useful life of only forty-five years. The then remaining term of the lease, in the absence of an earlier voluntary surrender or cancellation for default, was a few days less than ninety-four years.

The action was tried to the court without a jury, upon the pleadings, certain stipulations of counsel and unchallenged documentary evidence, and the oral testimony, within a narrow area, of witnesses in behalf of both parties. The facts, in so far as they reflect actual happenings, are not in dispute. The divergent oral testimony was oriented to the conflicting views of the parties upon questions of value as of the date of Mrs. Williams' death, and, in behalf of the several parties, was substantially interwoven with their respective interpretations of the relationship of the bank in its representative capacity to the Williams land and to the building thereon arising out of the factual history already recited. The substance and significance of that testimony will be considered briefly hereafter in an appropriate place.

The trial judge announced his decision of the case in an opinion, First National Bank of Kansas City v. Nee, D.C.Mo., 85 F. Supp. 840, accompanied by formal findings of fact and conclusions of law, whose verbal pattern generally accorded with requests of counsel, to the extent of their judicial adoption, and a judgment. The decision and judgment rejected the bank's demand and dismissed the action with prejudice at its costs. The bank, thereupon, moved for the amendment of the findings and judgment and for additional findings. That motion was denied, and in explanation of the denial a further opinion was filed. First National Bank of Kansas City v. Nee, D.C.Mo., 92 F.Supp. 328.

This appeal followed. Although its determination involves some subsidiary questions, it tenders only the single issue of the deductibility of the claimed depreciation. If such deductibility be sustained, reversal must be ordered; if it be rejected, the judgment must be affirmed. The parties do not present a controversy over the amount of depreciation, if any be allowable, although the defendant can not be said formally to agree that the bank has made claim to depreciation in the exactly proper amount if it is entitled to any deduction on the score. He challenges the right to any depreciation, not the amount thereof.

We consider that the judgment of the trial court was correct and must be affirmed. The bank's claim of the right to deduct depreciation under the instant facts is rejected in the course of our arrival at that conclusion. It will be observed that our approach to, and emphasis upon, the grounds of decision depart in some respects from the reported reasoning (see cited opinions in the case) of the trial judge. But we are entirely in agreement with his ruling in the action.

The right to depreciation is granted and defined in the following language from Title 26 U.S.C.A. § 23:

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

*   *   *   *   *   *

"(l) Depreciation. A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income." [1]

It must at once be obvious that unless an item of property in respect of which

1. The quoted language from the statute in its current form must be considered effective in the determination of income taxes for the years 1940 and 1941. However, it is appropriate to observe that it was not introduced into the law until a date substantially after those years and their respective reporting periods. Title 26 U.S.C.A. § 23(l), through 1940 and 1941, 75th Congress 3d Session, Ch. 289, Act of May 28, 1938, 52 Statutes at Large pp. 447, 462, so far as the present point extends, provided only for depreciation in the way of: "A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence."

depreciation has been claimed is properly within the reach of the quoted portion of the statute, those further provisions of the law are quite irrelevant which serve merely to define the basis upon which depreciation, validly asserted, is to be computed. The prescription of a depreciation basis presupposes, but does not amplify, depreciability. Nevertheless, we consider it appropriate briefly to quote the further statutory language discussed by the parties.

Title 26 U.S.C.A. § 23(n) defines the general basis for depletion and depreciation thus: "The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114."

Section 114, thus incorporated, Title 26 U.S.C.A. § 114, in its subsection (a), deals with the subject of depreciation, as follows: "The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property."

Section 113(b) last referred to, Title 26 U.S.C.A. § 113(b), is in this language: "The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided."

The further language of Section 113(b) is entirely irrelevant to the instant issue.

Title 26 U.S.C.A. § 113(a), among many other provisions dealing with its subject matter of the *"Adjusted basis for determining gain or loss"*, includes the following:

"(a) *Basis (unadjusted) of property.* The basis of property shall be the cost of such property; except that—
*  *  *  *  *  *

"(5) *Property transmitted at death.* If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition."

Both parties cite, and quote at length from, the applicable regulations. It is considered unnecessary generally to set out those excerpts from the regulations. However, one such item may be recalled, for the bank in its attempted proof of a depreciation basis has resorted to it. Section 29.23 (1)–4 of Chapter I, Title 26 C.F.R., contains the following sentence: "In the case of the acquisition on or after March 1, 1913, of a combination of depreciable and nondepreciable property for a lump price, as, for example, buildings and land, the capital sum to be replaced is limited to an amount which bears the same proportion to the lump price as the value of the depreciable property bears to the value of the entire property at that time."

That formula is to be understood against the background, (a) of the requirement that the valuation of depreciable property acquired by descent or devise is to be determined as of the date of the decedent's death, and, (b) of Title 26 U.S.C.A. § 113 (a) (5), supra.

Reverting, now, to the test of depreciability provided in Title 26 U.S.C.A. § 23 (*l*), supra, we are convinced that the district court correctly found that the bank had no interest in the building on the leased premises which was depreciable under the statutory definition. Clearly, the building was not "used in the trade or business" of the bank, as executor, within the meaning of subsection (*l*). A like appraisal of that language by which alone the statute measured depreciability through 1940 and 1941, rather than any inadvertence on the bank's part, undoubtedly motivated the omission from the initial returns of any demand for a depreciation credit. But we are equally satisfied that the building was not "held for the production of income" within the in-

In its present form the subsection was a part of 77th Congress, 2d Session, Ch. 619, Act of October 21, 1942, 56 Statutes at Large, p. 798, see section 121, p. 819. But by subsection (d) of the cited and applicable section 121 of the amendatory act, 26 U.S.C.A. § 23 note, it was provided that: "The amendments made by this section shall be applicable to taxable years beginning after December 31, 1938."

tendment of subsection (2) introduced later into the statute by amendment and made retroactively applicable to the taxable years 1940 and 1941. (Footnote 1.)

■ We consider that the expression "held for the production of income" must be understood as requiring for its applicability that property be held *by the taxpayer* for the production of income *for or to him*. This limitation, implicit, as we think, in the statutory language, is made clear when the legislative history of the amendment·is examined.[2] In emphasizing this construction, we are aware of, and agree with, the language of the regulations (immediately oriented to other texts, Section 29.33(b) of Chapter 1, Title 26, C.F.R., but apparently made applicable in this connection, Section 29.33(1) (2), id.) which emphasize the fact that it is not necessary to "holding for the production of income" that income actually accrue to the taxpayer from the property in question during the taxable year or years under scrutiny. What matters is the taxpayer's purpose to obtain income from it as the motive for his holding of it.

Putting aside for further consideration the admittedly indecisive question of the existence in the bank of legal title to the building, it is demonstrable from the documentary evidence in the case that no income accrued to the lessor or was intended to accrue to her or her devisees or assigns from that structure. The lessor reserved and received, and her successors continue to receive, rent solely from the ground. That was all Mrs. Williams had to lease, a fact which remains unaltered by the existence on the premises at the time of the negotiation of the lease of a building whose removal the lease contemplated, and was shortly effected. Once that removal was completed, the leased ground was unimproved property whose attractiveness may even have been diminished by the demolition.[3]

The sublease to Katz Drug Company fortifies the impression just suggested, for, by it the lessee undertook to pay a net

2. In the detailed discussions of the provisions of The Revenue Bill of 1942, contained in the Report upon that bill of the House of Representatives, Committee on Ways and Means (House Miscellaneous Reports, Vol. IV, 77th Congress, 2d Session, see p. 76), the committee said of the proposed amendment to the then existing law: "Subsection (d) of this section amends section 23 (*l*) of the Internal Revenue Code so as to allow, in addition to the deduction allowable under the existing law, a deduction for the exhaustion, wear and tear of property held by the taxpayer for the production of income, whether or not the property in question is used in the trade or business of the taxpayer, including a reasonable allowance for obsolescence. Except for this, the new allowance is subject to the same limitations and restrictions which have been applicable under this section prior to the present amendment."

And, later, in a similar Report by the Senate Committee on Finance, (Senate Miscellaneous Reports, Vol. IV, 77th Congress, 2d Session, see p. 88) concerning the same subsection, by that time relettered and renumbered, it was said: "Subsection (c) of this section amends section 23(*l*) of the Code so as to allow, in addition to the deduction allowable under the existing law, a deduction for the exhaustion, wear, and tear of property held by the taxpayer for the production of income, whether or not the property in question is used in the trade or business of the taxpayer, including a reasonable allowance for obsolescence. Except for this, the new allowance is subject to the same limitations and restrictions which have been applicable under this section prior to the present amendment."

3. It may be true that the earlier status of the leased land as improved property prompted the lessor to exact, and induced the lessee to agree to, a higher rental than might have been obtainable if the site and its neighborhood had theretofore been unimproved. But that reflection leaves unaltered the fact that all Mrs. Williams leased was the site. Nor is the situation affected by the inadequacy of the years of living remaining to Mrs. Williams after the execution of the lease for her complete exhaustion of the undepreciated investment in the old building. As counsel agreed upon the argument, that investment represented an element of cost to her of the rights which the lease reserved and assured to her.

rental for the improved premises, slightly less than three times the net ground rent reserved under the Williams lease. The difference resulted from the lessee's erection of the building. And, so far as we can perceive, the attribution exclusively to the ground of the rentals provided under the Williams contract is equally effective in respect of Mrs. Williams while she lived and, after her death, in respect of the bank, during the period of administration as executor and thereafter and now as trustee.

Not at all conclusive, but somewhat instructive, regarding the source of the rentals reserved in the Williams lease is the bank's return as executor for federal estate tax purposes. (vide supra). It expressly identifies such source as the "ground" of the specifically described premises. We shall have occasion later to refer in more detail to that language in another relation.

The building unquestionably produces, and was designed to produce, income; but not for the lessor or her successors. Granting that it is not possible to analyze with legal assurance the total rental reserved under the sublease to Katz Drug Company and to assign its component parts respectively to their appropriate sources, it is nevertheless true that the land by contract brought, and brings, one prescribed rental to its owner, whereas the improved unit brought and brings from its final lessee and user a different, and much larger, rental, of which the portion in excess of the ground rent accrues to the successor of the erector of the building. So, in a practical sense, the building brought and brings that excess.

It is conceded by the bank that, for want of any cost, or other statutorily allowable, basis for depreciation, Mrs. Williams so long as she lived after the execution of the lease had no right to deduct from her gross income for income tax purposes anything in the way of depreciation upon the building erected by the lessee. The lessee alone paid for it and was entitled to credit against income for its depreciation.

But the bank claims that, having acquired the right and title of the lessor by devise, it has under the cited statutes (supra) a valid basis for depreciation. We do not understand the bank to contend that by Mrs. Williams' will she transmitted to her devisee in trust any interest or title in the property larger than she herself possessed. The interest, title and right thus owned by her and transmitted seem to have included (with possible others) these items, (a) the title in fee simple to the land subject to the terms and provisions of the lease so long as it shall extend; (b) the right to receive the prescribed rentals so long as the lease persists, together with the security for their payment provided in the building; (c) the right from time to time to examine and inspect the premises by way of assurance of the lessee's fidelity to its obligations; and (d) the reversion in the property, subject to and as provided in the lease either at its contemplated termination or upon voluntary surrender or an elected cancellation for default together with the full ownership of such building as, at the time of such termination or cancellation, shall be located on the land. That building may be, but if the lease runs it contemplated course, almost inevitably will not be, the one now in existence, for the close of the prescribed term of the lease is almost a half century beyond the end of the agreed useful life of the building.

█ It is insisted by the bank that, in addition to the rights just recalled, Mrs. Williams had, and it has, under the law of Missouri, the legal title to and ownership of the building erected by the lessee. That Missouri's law controls in the construction of a lease of this character upon Missouri land is admitted and is unquestionably true. But the cited decisions of the Missouri courts appear to fall somewhat short of the bank's contention respecting them, in the light of the language of the lease before us.

█ It may be granted that in Missouri title to a building erected by a tenant on a lessor's premises, the contrary intention not otherwise appearing from the lease, vests on its erection in the lessor unless the lease authorizes the lessee to remove it from the premises during the term. Mercantile-Commerce Bank & Trust Co. v. Mid-City Realty Co., 348 Mo. 1006, 156 S.W.2d 730; Buhlinger v. United Firemen's Ins. Co., Mo.

App., 16 S.W.2d 699. But under the lease before us the lessee has the express and carefully particularized right at its election and without the lessor's right of interception to remove during the term the building now on the property, (vide supra) and that right has been said by Missouri authority to be valid and enforceable. Schneider v. Bulger, Mo.App., 194 S.W. 737. It is true also that the title to a building constructed by a tenant ordinarily passes on its erection to the lessor, where the lease stipulates that on its termination or expiration the particular building shall belong to the lessor. Bueltermann v. United States, 8 Cir., 155 F.2d 597, reversing Mississippi Valley Trust Co. v. United States, (Bueltermann v. United States) D.C.Mo., 61 F.Supp. 451. See also Mississippi Valley Trust Co. v. United States, two cases, 8 Cir., 157 F.2d 516. But, with pointed clarity, the present lease limits the lessor's ownership of any building to such structure, almost certainly not now in existence, as may be located on the land at the termination or expiration of the lease, (vide supra). The bank's arguments (a) that, ordinarily, a provision in a lease requiring the lessee to erect a building on the demised premises is construed as forbidding him to remove it, and (b) that a like construction will be inferred in a lease requiring such an erection in circumstances where the removal of the building would so far reduce the value of the premises as to render such removal unreasonable, may be granted as statements of valid abstract rules of law. But they are pointless here in view of the lessee's express right to remove buildings.

However, we need not, and do not determine with finality the ownership of the legal title to the building presently on the land, for that consideration is not alone decisive upon the right to claim depreciation on the score of its deterioration. Helvering v. F. & R. Lazarus & Co.. 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226; Lynch v. Alworth-Ste-

phens Co., 267 U.S. 364, 45 S.Ct. 274, 69 L. Ed. 660. The controlling inquiry is whether, in the situation under review regardless of who technically owns the wasting improvement, the claimant of depreciation holds it for the production of income for the claimant's benefit and has in it a cost basis or, within the meaning of the statutes already cited, a substituted basis upon which depreciation may be computed.

In the presentation of its appeal to this court, the bank, both in briefs and in oral argument, urges upon us, besides the statutes and regulations already cited and partially quoted, certain reported opinions. Some of these reflect decisions bearing only remotely or suggestively upon the issue, which we need not examine in detail. But it rests its contention directly and principally upon four opinions, one rendered by this court and three by the tax court. All of those cases arose out of long term leases and the erection by lessees of valuable buildings on leased premises belonging to lessors. But each of them differed substantially from this action both in the terms of its lease in suit and in its collateral record submitted for adjudication. Brief separate references may now be made to the several cited cases, with only a single suggestion of the points wherein the case before us differs from all of them.

Bueltermann v. United States, supra, is particularly stressed by the bank as an instructive and controlling ruling within this circuit. It involved the determination of the amount of income attributable, in harmony with the rule in Helvering v. Bruun, 309 U.S. 461, 60 S.Ct. 631, 84 L.Ed. 864, to the cancellation of a long term lease and the return to the lessor's devisees of the leased premises together with a valuable building [4] erected by the lessee. This court, recognizing the taxability at the time of profit resulting from such a transaction, nevertheless reversed a district court judgment sustaining the tax assessed and deny-

4. Parenthetically, a problem which would not occur at this time, since intervening legislation has eliminated the taxability of such a situation. Title 26 U.S.C.A. § 22(b) (1). See also Title 26 U.S.C. A., § 113(c) denying increase or diminu-

tion of the basis or adjusted basis of property on account of income derived by a lessor from property within the reach of Title 26 U.S.C.A. § 22(b) (11).

ing its recovery after payment by the taxpayers. And its ruling was based principally on these factual points: (1) Under the lease involved the exact building erected in the first instance by the lessee was to become the property of the lessor in the event of forfeiture or termination of the lessee's interests, and the court (vide supra) construed that clause to effect the vesting in the lessor of title to the building in the instant of its erection. (2) The lessor having died during the existence of the lease and before its cancellation, the title of the devisees was acquired, and the value of the property as a basis for determining income upon the forfeiture was determinable as of the date of the lessor's death. (3) In the valuation of the property for estate tax purposes in the lessor's estate, the land and building were separately appraised and a value of the estate's interest in the building was fixed at $50,000.00 (see reported opinion, but, also and much more clearly, the district court's opinion, 61 F.Supp. 451) the exact value assigned to the building at the time of the forfeiture, in consequence of which no income or profit accrued to the devisees.[5]

In Currier, 7 T.C. 980, the tax court allowed annual deductions for depreciation in respect of the determined fair market value of the taxpayer's fractional share of a building, with a determined future useful life shorter than the remainder of the lease term, erected by the lessee under a long term lease, the taxpayer being a devisee of the lessor. These Currier facts are to be noted: (1) The lease provided that the building to be erected was to be and remain the property of the lessor.[6] (2) Actually, by a supplement to the original lease, the lessor undertook to and did advance a considerable portion of the cost of erecting a much larger building than the lease at first contemplated.[7] (3) In the lessor's federal estate tax return both land and building were returned and valued as the tax base, but without the allocation in severalty to the land and the building of the elements of such valuation. It is made satisfactorily to appear that, for a time, the Commissioner acquiesced administratively in the theory underlying the Currier ruling, but later formally withdrew such acquiescence.

Considered out of its order, for reasons shortly to be made obvious, is the recent case of Moore, 15 T.C. 906, in which, incidentally, the trial judge's ruling in this action was examined and criticised. There the tax court allowed annual depreciation deductions to a taxpayer in respect of a one-half interest inherited from her mother[8] in the determined value of a building erected by the lessee upon real estate leased under a long term contract by the taxpayer and her mother. There, too, the lease provided ownership of the building by the lessors, which the tax court construed to mean the original building. And in the mother's estate tax return both building and land were valued, though without segregation and allocation to each of its contribution to the assigned gross value.

Finally, Pearson, Jr. et al. v. Commissioner of Internal Revenue, 13 T.C. 851

---

5. Manifestly the problem of depreciation was not involved in the Bueltermann case. But it must not be thought that we disregard it as authority on that account, if it were otherwise indistinguishable. The interrelation of Sections 23(n), 114, 113(b) and 113(a) (5), supra, (cited in their logical order for our present purposes) of Title 26 U.S. C.A., forbids its summary exclusion from consideration. The tax court cases do involve the impact of annual depreciation.

6. The opinion places special emphasis on this point. It deals twice with the question, first seeming to concede that its ruling would or might be otherwise if under the lease the replacement of the original building with a new one were contemplated 7 T.C. at page 984, and then emphasizing as a ground of its reasoning that "it seems clear at least that the obligation assumed was to return the same building, not a new one".

7. Admittedly, this was not a substantial ground of the opinion, for the supplemental agreement also devised a plan, whose actual operation is not clearly disclosed, for the eventual liquidation of the advancement.

8. She was herself the original owner and lessor as to the remaining one-half interest.

was emphasized in the bank's briefs and oral argument. There the majority of a widely divided court granted annual depreciation to the taxpayers upon the basis of their one-third share (received from the estate of the mother of one of the taxpayers who had herself received the interest by deed made in contemplation of death from her mother, the survivor of the original lessors, husband and wife and community owners) of the value of a large building erected by a lessee on Dallas, Texas real estate leased for a long term. The estimated useful life of the building was slightly less than the remainder of the leasehold term. In the estate of the community survivor of the lessors, rejecting the contention that an undelivered deed from her to her children had eliminated the leased premises from her estate for estate tax purposes, the commissioner had set up a valuation for estate tax purposes of $412,500.00 on the property basing it upon a capitalization at four percent of the $16,500.00 annual net ground rental reserved in the lease. The grantees in the deed acquiesced in, and settled the tax liability upon the recognition of, that valuation. When the mother of the Pearson taxpayer died, her one-third interest was returned—but as property previously taxed —at one-third of $412,500.00 and the return was accepted. In the reported tax court case the taxpayers' claim to deduction for depreciation was sustained by the majority of the court, but the basis on which the deduction was allowed was not any allocated value of the taxpayers' inheritance attributable to the building, but rather one-third of $450,000.00 which the parties had stipulated to be the minimum value of the building without reference, however, to the value of the land as leased. The taxpayers in fact made claim that the land under lease had no real fair market value, or at most a nominal value, in view of the length of the remaining term and the post-

ponement of the ultimate reversion. These things are to be noted in the tax court's report of the case. (1) The lease provided that all improvements erected by the lessee on the leased premises should become the property of the lessor. (2) The majority of the court simply followed the earlier Currier case. (3) It also completely disregarded the value of the land and its estimation and the basis thereof, in the surviving lessor's estate tax proceeding and that of the mother of one of the Pearson taxpayers.

But the Pearson case was pending in the Court of Appeals, Fifth Circuit, when this action was argued in this court. And on April 11, 1951, the tax court's judgment was reversed and the cause remanded with directions to restore the litigated deficiency. Commissioner of Internal Revenue v. Pearson, 5 Cir., 188 F.2d 72. The reversing opinion requires attention. It concedes as an abstract rule, inapplicable, however, in the case then under review, that "though an ancestor, lessor, having no cost basis, does not have a depreciable interest in a building erected by a lessee, an heir may, as an incidence of estate taxation, and, under Section 113(a)(5), 15 I.R.C., have a basis for depreciation and an interest to depreciate."[9] Then, with inescapable present significance, the court says:

"For here, notwithstanding the incompletely phrased stipulation that the fair market value of the Gulf States building was at least $450,000, it is established by the undisputed evidence that the fair market value of the building alone, as distinguished from the value of the property as a whole, was, as to the lessor, zero. For it is established that the property was valued for estate purposes upon the basis of the cash ground rental of the lot beginning in 1925, and continuing for the term of the lease, a figure certainly less than its value in 1940.

9. We do not consider it necessary either to declare the possible existence of such basis and interest or if they are allowed, to concur in their invariable attribution to income taxation. Certainly, situations exist in which the question arises without income tax liability, as, for example, where the taxpayer has received the property by inheritance from a parent who had taken it as the sole asset of an estate previously taxed, or where the property has come from an estate too small in value to be taxable or required to make a return.

"It cannot, therefore, be claimed, as taxpayer and the Tax Court do, that the value fixed for estate tax purposes in 1940, was the value of the building alone, with nothing allowed for the land, when the undisputed facts show that, beginning in 1925, the land without the building on it had a ground' rent value of at least $16,500 a year."

Of the use of an estate tax valuation as a depreciation base, the court observes: "It is true enough that the estate tax valuation, fixed under the invoked section of the Code, does operate to furnish a new base for determining the gain or loss from the sale or other disposition of property, and, to the extent that depreciable property enters into it, for the depreciation of that property. In using the estate tax-valuation of property transmitted, however, the burden of showing whether any, and, if so, how much, of this value is made up of property in which the taxpayer has a depreciable interest, is upon the taxpayer,' and, upon the undisputed facts as to the valuation for estate tax purposes here, that burden is a heavy one."

Finally, upon the question of value, the court adds:

"Indeed, in the light of the stipulation that Mrs. Rowan's whole interest in the property for estate tax purposes was valued at $412,500, the figure which at four percent would produce $16,500 as cash rental, the amount of $450,000 fixed for the building cannot possibly be taken as intended to be a valuation of the interest of the estate in the building as distinguished from the property as a whole.

"Upon the record as a whole, the stipulated value of the building is not at all determinative of the question posed here. Indeed, it is without material bearing on it. It does not purport to deal with, much less to settle, what value, if any, was attributed to the building alone for estate tax purposes. It cannot on this record be taken as proof that the building was accorded any value as a depreciable asset in the hand of the taxpayer."

The fifth circuit court of appeals, while questioning and inferentially criticising, does not overrule the Currier and Moore cases. While it directly reverses the Pearson case, it does not necessarily reject the latter's acceptance of the reasoning of the Currier opinion, and rests its decision rather on the manifestly correct view that in its prevailing Pearson opinion the tax court did not preceive the taxpayers' complete failure to establish any statutorily allowable basis for depreciation, even if their right to depreciation were granted.

Bryant Trust, 11 T.C. 374, upon its peculiar facts, notably the contractual provision for an initial rent free period during which the lessee's building costs would be restored to him, presents a situation completely distinguishable from the one before us.

█ The Williams lease and the record before us are far different from the Bueltermann situation and the tax court cases. Here the building to be, and which was, initially erected is nowhere declared, either expressly or by reasonable implication, to be the property of the lessor. The contrary really appears. It stands primarily as security for the lessee's performance of its covenants; therefore, belongs to the lessee subject to that pledge. Its useful life was barely one-half the duration of the lease, indicative of the virtual certainty of its replacement. Its demolition for the purpose of erecting a new building at the election of the lessee, and with temporary security to protect the lessor, is expressly provided for. And at the end of the leasehold term, not the present structure, but the building then on the premises, is what passes with the reversion of the land to the successor or successors of the lessor. Only in the event of an early and unforeseeable voluntary surrender of the lease or forfeiture for default may the capture of the building by the owner or owners of the soil occur. It is not ordinarily the policy of the law to measure the rights of parties to contracts upon the basis of a forfeiture, which, though contractually possible, has not occurred and is neither imminent nor probable. People of Puerto Rico v. United States, 1 Cir., 132 F.2d 220; Board of Commissioners of Mahoning County v. Young, 6 Cir., 59 F. 96.

The estate tax record has already been quoted. Reasonably understood, it discloses

the valuation at $125,000.00 of the ground, subject to, and enhanced in worth by, the lease. This conclusion seems to be inescapable. The language of the return supports it. And it is eminently reasonable. At Mrs. Williams' death the lease provided an annual rental very shortly to reach $10,000.00 for nearly ninety-four years. $10,000.00 is eight percent of $125,000.00; four percent of $250,000.00. As the Court of Appeals concluded in the Pearson case, so here on even surer grounds, the entire estate tax valuation should be attributed to the land with the lease.

The understanding just advanced of the significance of the allusion in the federal estate tax return to the leased premises, is fortified by two further considerations. The first of these is that in the same return and on the same schedule two improved parcels of urban real estate were listed and valued, and, in the case of each, its improvements were briefly but carefully described. In that course emphasis was inferentially placed by the executor itself on the contrary treatment of the property now involved. The second supporting consideration is rooted in the printed language of the familiar Treasury Department form 706, upon which the return was made. For many years, including the time of the making of the Williams estate tax return, it contained a specific instruction in connection with its *"Schedule A, Real Estate"*, in which persons preparing returns were directed, in listing and valuing real estate, to give its area and the basis of its returned value, and if it was improved, a short statement of the character of the improvements. Now, the return in the Williams estate was prepared and made by a large metropolitan bank as executor. We must assume that it acted through its experienced trust department and upon the advice of competent counsel. The manner of returning the leased property must have been resolved upon understandingly and purposefully. Its signifi-

cance, first, in its own detached language, secondly, in association with the listing and evaluation of other real estate in the same schedule, and finally, in the light of the standing instructions in Form 706 should not be disregarded.

Oral testimony of expert witnesses in behalf of the defendant also supports that view. [10] We need not repeat the testimony, or discuss it beyond the observation that it convincingly justifies the thought that the land alone, under the lease, was fairly and reasonably worth the full tendered and approved value. And it clearly sustains the contention that the ground was valued, and correctly valued, in that manner in the estate tax return.

The oral testimony in behalf of the bank was presented in its effort, by establishing separate valuations for the building and the land, both unaffected by the lease, proportionately to resolve the $125,000.00 valuation into two items, one the value of the building the other that of the land, and thereby to meet the test of the statutes already quoted, especially Title 26 U.S.C.A. § 113(a)(5) and the cited language of Section 29.23(1)–4 of Chapter I, Title 26 C. F.R. But it completely neglects both the real ingredient of value in the estate tax appraisal and the actuality of the Williams lease of the land alone.

Besides, it is unrealistic in its approach. Illustrating, representatively, the witnesses for the bank expressed the opinion that, with minor variations, the fair market value of the land was $92,316.00 and of the building $158,869.71, both "disregarding the lease". Generally, and somewhat inexactly, they also asserted that the existence of the lease "reduces the value" of both land and building. As one witness expressed his thought "Oh yes, if subject to a lease of $10,000 a year it would be less than if someone owned that building and land free and clear". In such testimony a demonstrably mistaken assumption is involved, namely, that there is a lease of land

10. It is entirely consistent with the stipulation which merely declares that "On September 23, 1939, Lydia S. Williams' interest in the 40th and Main Streets property had a value of $125,000.00," without defining, or particularizing respecting, the nature of, or items constituting, that interest. It is similarly consistent with the trial court's finding on the point, which follows the stipulation.

and building at a rental of $10,000.00 a year. The land alone is rented for that sum, and quite obviously to the enlargement of its value. The land and building as a unit are rented under a sublease for $27,000.00. Questions whether a lease of the land, only, for $10,000.00 per annum would depress its value, or a lease of land and building for $27,000.00 per annum would depress the values of land and building, or either of them, might have been more instructive.

On the whole oral testimony, we are persuaded that the witnesses testifying in behalf of the defendant the more accurately articulated their evidence into the real relation of the bank to the property and adopted a more realistic position upon the subject.

The trial judge's references to the testimony just mentioned, and his findings and conclusions generally, in the light of his reported opinions in the case, are entirely consistent with the views herein expressed. The apparent inconsistency between his adoption of finding 27 requested by the bank and conclusion of law 2 requested by the defendant is eliminated by a fair examination of the entire opinion in which those findings and conclusions are announced.

Without unnecessary summary, we reiterate our conclusion that the judgment of the District Court was and is correct. It is, therefore, Affirmed.

COLLET, Circuit Judge, concurs in the result.