

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DAVID COX, PLATTE COUNTY ASSESSOR, AND PARK HILL SCHOOL DISTRICT, | ) ) ) ) | |
| Respondents, | ) ) | |
| v. | ) ) | WD83097 |
| GRADY HOTEL INVESTMENTS, LLC, | ) ) | Opinion filed: July 28, 2020 |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF PLATTE COUNTY, MISSOURI**
**THE HONORABLE THOMAS C. FINCHAM, JUDGE**

Division Two:  Karen King Mitchell, Presiding Judge,
Anthony Rex Gabbert, Judge and W. Douglas Thomson, Judge

Grady Hotel Investments, LLC ("Grady") appeals from the judgment of the Platte County Circuit Court reversing the decision of the State Tax Commission ("STC") finding Grady only has a leasehold interest in the Marriott Hotel at KCI ("Property") and assessing the taxable valuation of that interest at zero ($0.00) pursuant to the bonus value method.  We find the STC erred in concluding that Grady's interest in the Property was a leasehold interest and assessing the taxable valuation at zero ($0.00) because that determination was contrary to the plain language of the contracts between Grady and the City of Kansas City ("City").  We affirm the judgment of the trial court reversing the decision of the STC and remanding to the STC for reconsideration consistent with this opinion.

**Factual and Procedural History**

The material facts are not in dispute. On April 29, 2015, Grady purchased certain improvements from Host Hotels & Resorts, L.P. ("Host"). The improvements are located at 775 N. Brasilia Ave., Kansas City, Missouri 64153 on land owned by the City at the Kansas City International Airport ("KCI"). The City is a political subdivision of the State of Missouri which makes the land on which the improvements are located exempt from payment of real property taxes in accordance with Missouri Constitution article X, section 6.

Grady and Host entered into an Agreement of Purchase and Sale for the improvements located upon the City's real estate. The purchase price for the improvements was $8,500,000. Host executed a "quitclaim deed to improvements" ("Quitclaim Deed to Improvements") conveying all interest it had in the improvements to Grady, such interest defined as "the buildings, structures, fixtures and improvements (collectively, the "Improvements") now located on, over and upon that certain piece, parcel or tract of land", subsequently identifying the land by an attached legal description.

Host's ownership of the Improvements it sold to Grady arose from a Lease and Concession Agreement ("2007 Lease") which it entered into with the City on October 14, 2007, for the stated purpose of continuing to operate a hotel at KCI.[1] The 2007 Lease was assigned to Grady as part of the transaction with Host in April 2015. The 2007 Lease included the Leased Premises and the Leasehold Improvements as those terms were defined in the Lease. The Leased Premises were defined as "the collective locations leased to Lessee" and by a legal description contained in an exhibit attached to the Lease. The Leasehold Improvements were defined in the Lease as

---

[1]The City and Host were parties to a prior Concession Agreement dated March 22, 1971, and three subsequent amendments with the same subject matter. The 2007 Lease expressly terminated the prior Concession Agreement.

"collectively all improvements located on and within the Leased Premises." In May 2015, a Second Amendment to the 2007 Lease ("2015 Amendment") was executed between the City and Grady modifying certain provisions in the 2007 Lease.

The Platte County Assessor ("Assessor") valued Grady's interest in the Property at $11,222,000, for the 2016 tax year.[2] On June 17, 2016, Grady appealed the assessment to the Platte County Board of Equalization ("BOE") listing itself as the owner and stating this was not rental property. On July 11, 2016, after a hearing, the BOE valued Grady's interest in the Property at $13,447,000. Grady appealed the BOE's valuation to the STC.

On January 16, 2018, a STC Hearing Officer ("Hearing Officer") set aside the BOE's valuation. Hearing Officer relied on section 137.115.1[3] for the method of valuation of the true value in money ("TVM") of Grady's possessory interest in the Property less the total dollar amount of costs paid toward any new construction or improvements. Hearing Officer found the characterization of Grady's interest as a leasehold or fee simple irrelevant because Grady has a possessory interest in the Property in that it may occupy and use the Property and, therefore, section 137.115.1 applies. Consistent with section 137.115.1, the Hearing Officer found the TVM of Grady's possessory interest to be $7,300,000, to-wit: the purchase price stated in the Agreement of Purchase and Sale of the improvements in 2015 ($8,500,000), less costs paid toward new construction or improvements completed after January 1, 2008 ($1,200,000). Hearing Officer declined to address the constitutionality of section 137.115.1, as beyond the authority of an administrative agency.

---

[2]In its brief, Assessor states that it valued the Property at $13,447,000 but in its petition for review in the circuit court of Platte County states it valued the Property at $11,222,000 for the 2016 tax year. The STC's decision reflects that Assessor testified that the value of the Property in 2016 was $11,222,000. This discrepancy is immaterial to this opinion. The assessment was Grady's interest in the improvements only.
[3]All statutory references are to RSMo 2000, as supplemented, unless otherwise noted.

Grady sought review of Hearing Officer's decision and appealed to the full STC. The STC entered an order setting aside the Hearing Officer's decision. The STC noted that Grady offered testimony from Randy Meyer ("Meyer"), the CFO of Grady's parent company, and David Long ("Long"), the Deputy Director of the Kansas City Aviation Department, both of whom opined that Grady's interest in the Property was a leasehold interest. The STC also noted that Grady's expert, Thomas Slack ("Slack"), a certified general real estate appraiser, opined a bonus value of zero ($0.00) as of 2016. The STC held that the City is the owner of the fee simple interest in the land and improvements, that Grady has a leasehold interest in the land and improvements, that the bonus value methodology is the appropriate valuation approach, that the property has no bonus value and, consequently, that the deduction to the TVM required by section 137.115.1 is unnecessary. Finding a leasehold interest in property owned by the City is considered real property for the purpose of ad valorem taxation, the STC cited *Frontier Airlines, Inc. v. State Tax Commission*, 528 S.W.2d 943 (Mo. banc 1975), for its conclusion that such an interest should be valued by the bonus value method, which is defined as the difference between economic rent and the contract rent for use and occupancy of the premises.[4] The STC declined to render a decision on the constitutional challenge as outside the authority of an administrative agency.

On July 25, 2018, Assessor sought review of the STC's decision with the Platte County Circuit Court. Park Hill School District's ("District") motion to intervene was granted. After a hearing, the trial court entered its judgment reversing the STC's decision and remanding to the STC for reconsideration finding the STC's decision that the taxable value of Grady's interest in the Property is zero was arbitrary, capricious, and unsupported by the law and the facts, specifically that (a) the leasehold improvements located on the Property are owned by Grady, not the City, and

---

[4]Because we find that Grady's interest is not merely a leasehold interest, we do not fully develop the bonus value method and its related aspects.

therefore, a bonus value appraisal is not applicable to its valuation; (b) the STC should consider the sale price of the Property as evidence of value; and (c) the STC should not exclude value evidence other than a "bonus value" appraisal.[5]

Grady appealed the trial court's judgment to the Supreme Court which then transferred it to this Court.

**Standard of Review**

On an appeal from a judgment of a trial court addressing the decision of an administrative agency, we review the decision of the administrative agency and not the judgment of the trial court. *Bird v. Mo. Bd. of Architects*, 259 S.W.3d 516, 520 n. 7 (Mo. banc 2008). Notwithstanding, in our mandate, we reverse, affirm or otherwise act upon the judgment of the trial court. *Id.* "Pursuant to Mo. Const. art. V, section 18 and section 536.140, we must determine 'whether the agency's findings are supported by competent and substantial evidence on the record as a whole; whether the decision is arbitrary, capricious, unreasonable or involves an abuse of discretion; or whether the decision is unauthorized by law.'" *Henry v. Mo. Dept. of Mental Health*, 351 S.W.3d 707, 712 (Mo. App. W.D. 2011) (quoting *Coffer v. Wasson–Hunt*, 281 S.W.3d 308, 310 (Mo. banc 2009)).

"'When an administrative agency decision is based on the agency's interpretation and application of the law, we review the administrative agency's conclusions of law and its decision

---

[5]We note that all three parties in their respective pleadings request attorneys' fees in their prayers for relief. The trial court's judgment did not dispose of these requests, "which '*can* arrest the finality of the judgment,' and implicate this Court's jurisdiction to hear the appeal." *Union Manor v. Missouri Dep't of Health and Senior Servs.*, 596 S.W.3d 673, 677 n.2 (Mo. App. W.D. 2020) (quoting *Ruby v. Troupe*, 580 S.W.3d 112, 114 (Mo. App. W.D. 2019)). A trial court's "failure to address an attorneys' fees issue will impact the finality of the judgment only when the claim is properly pleaded *and* pursued by the requesting party. Under the first step, 'a party must plead a basis for an award of fees, ***in addition to simply including a request for attorneys' fees in its pray for relief*.'" *Id.* (citation omitted). Here, each party only states a bare request for attorneys' fees without citing any authority for such an award; thus, the request for attorneys' fees was not properly pleaded. *Id.* Nor does it appear that any party pursued its request for attorneys' fees beyond merely mentioning it in their respective petitions or answer. *Id.* "Under *Ruby*, this is an additional independent reason for deeming the [trial] court's judgment final and appealable, notwithstanding its failure to address the issue of attorneys' fees." *Id.*

*de novo*, and we make corrections to erroneous interpretations of the law.'" *Algonquin Golf Club v. State Tax Commission*, 220 S.W.3d 415, 418 (Mo. App. E.D. 2007) (citation omitted). "'This court reviews the decision of the STC and not the hearing officer.'" *Rinehart v. Bateman*, 363 S.W.3d 357, 362–63 (Mo. App. W.D. 2012) (citation omitted).

## Analysis

### Point I[6]

In point one, Grady argues that the STC properly held that Grady has a leasehold interest in the Property because Grady does not own the leasehold improvements on the basis that the 2007 Lease does not permit Grady to remove any of the improvements at the conclusion of the lease. We disagree.

The STC held that the City is the owner of the fee simple interest in the land and improvements and that Grady merely has a leasehold interest in the land and improvements. In so finding, while noting the language in the contract that Grady owned the Improvements upon which the Assessor relied for its argument, the STC did not offer any analysis of the contractual language contained in either the 2007 Agreement or the 2015 Amendment and, instead, seems to rely on the testimony provided by Meyer, Long, and Slack opining that Grady's interest in the Property was only a leasehold interest.

> The interpretation of a lease agreement is a question of law, to which the general rules of contract construction apply. The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention. The intent of the parties is to be based upon the terms of the contract alone and not on extrinsic evidence unless the contract language is ambiguous. An ambiguity arises only if the terms are reasonably open to more than one meaning, or the meaning of the language is uncertain. Mere disagreement between the parties does not render contractual terms ambiguous. Rather, the test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction when the words are given their plain and ordinary meaning.

---

[6]Grady's point one is address by Assessor's point 2 and the District's points one and three.

*Langdon v. United Restaurants, Inc.*, 105 S.W.3d 882, 887 (Mo. App. W.D. 2003) (internal citations omitted).

Here, the contract language addressing Grady's ownership of the improvements is not ambiguous. The 2015 Amendment contains the following provisions regarding ownership of the improvements:

> WHEREAS, City and Host . . . are parties to a Lease and Concessions Agreement dated October 14, 2007, as amended ("Agreement")[.]
>
> WHEREAS, pursuant to the terms of the Agreement, Host has **owned** the Leasehold Improvements located at the Leased Premises, and operated the Facility located thereon; and
>
> WHEREAS, Host is selling its leasehold interest in the Facility and Leased Premises to Lessee [Grady], by several conveyance documents, one of which is the Assignment And Assumption of Lease and Concession Agreement dated April, 2015 ("Assignment"), a copy of which is attached hereto as Exhibit B[.]
>
> Section 104. Lessee is Assignee of Agreement. The City approves Lessee as an assignee of the Agreement and pursuant to the terms of the Agreement, and pursuant to Section 801.c. of the Agreement Lessee agrees to assume all of Host's interests and obligations in the Agreement, as amended.
>
> Article V. Title and Leasehold Improvements
>
> Section 501. Title to Site. Unless otherwise provided in the Lease, title to the Leased Premises, but not the Leasehold Improvements, whether existing or installed by Lessee as part of the Lease, shall remain and are at all times in the City.
>
> Section 503. Title to Leasehold Improvements. **All Leasehold Improvements** approved by the City and any City-approved additions and alterations to these Leasehold Improvements **shall become and remain the property of Lessee** until the expiration or termination of this Agreement. . . . Upon expiration or termination of this Agreement for any reason, all Leasehold Improvements shall become the property of the City, except for trade fixtures, signs and other personal property …which shall remain the property of Lessee[.][7]

(Emphasis added).

---

[7]The language of section 501 and 503 were also contained in the 2007 Agreement.

The express language of the 2015 Amendment clearly reflects the intent of the City and Grady to treat title to the site and title to the Improvements separately as they are addressed in two separate provisions. Section 501 entitled "Title to Site" clearly and unambiguously states that title to the land only remains with the City while expressly providing that the title to the improvements do not remain with the City. Section 503 entitled "Title to Leasehold Improvements" clearly and unambiguously provides that title to the improvements becomes and remains in Grady, the lessee, for the duration of the 2007 Agreement. It is clear from these provisions that the parties intended to treat title to the land and title to the improvements separately—the City to retain title to the land and Grady to retain title to the improvements.

A similar distinction was found in *KJC Development Corp. v. Land Trust of Jackson County*, 6 S.W.3d 894, 897 (Mo. banc 1999), where the Supreme Court held that a lease severed the building from the land for the duration of that lease and then reattached the building to the land by operation of law and the terms of the lease. There, the property at issue was a 17-story office building and land owned by Gates. *Id.* at 896. Gates signed a 99-year lease of the property but eventually the building sat empty, the property taxes were not paid and both the lessor and lessee became defunct. *Id.* Tax liens on both the land and building were foreclosed and the land and building were offered for sale separately. *Id.* KJC bought the land and Land Trust of Jackson County was awarded the building. *Id.* KJC claimed the lease remained in effect binding Land Trust as lessee, that Land Trust defaulted on its obligation to pay rent under the lease, and sued to quiet title to and possession of the building. *Id.* The trial court concluded KJC was the owner of the land, Land Trust was the owner of the building and neither party was burdened by the lease. *Id.*

The Supreme Court held that the respective interests of the parties were not subject to the lease as it was abandoned and forfeited by both prior parties before the foreclosure sale. *Id.* at 897. The Court further found that upon this abandonment and forfeiture, the lease terminated and the building became reattached to the land by operation of law and the lease itself. *Id.* The Court held that the lease severed the building from the land and provided that upon forfeiture or termination of the lease, the building shall be reattached to the realty and shall revert and become the property of the Lessors free and clear of any claim of the Lessee. *Id.* "[E]ven absent the reattachment provision in the lease, basic principles of landlord/tenant and property law create the presumption that a building reverts to the land on which it sits in the absence of a valid lease." *Id.* Thus, the deed issued to Land Trust for the building transferred no interest at all because the building by the time of the foreclosure sale had reattached to the land. *Id.* "[T]itle to building and the land were governed by the [l]ease. Upon termination of the [l]ease, the building reattached and became part and parcel of the [Lots]." *Id.* at 898.[8]

Similarly, here, title to the improvements and title to the land were governed by the 2007 Agreement and the 2015 Amendment. The 2007 Agreement severed the Improvements from the land providing Host, and subsequently Grady, title to the Improvements while title to the land remained with the City. Likewise, the 2007 Agreement also expressly provides that title to the Improvements returns to the City upon the termination of the 2007 Agreement.

The ancillary documents signed by the City, Host and Grady as part of the transaction also indicate the parties' intent to treat title to the land and title to the Improvements separately. The

---

[8]*See also* Real Estate Investor's Deskbook, Ground Leases § 9:159 (3d ed. 2020) ("a ground lease is usually for a long term (e.g., 25 to 40 years and sometimes as high as 99 years), because the ground tenant (generally a developer) wants assurance of a sufficient term over which to amortize his investment in the improvements. . . . The lease of land (by use of a ground lease) makes it possible to separate the ownership of land from the ownership of the buildings and improvements constructed on the land. By leasing rather than selling land ready for development, both landowners and developers can derive substantial investment, tax, and financial benefits.")

Quitclaim Deed to Improvements which identifies the improvements as "the buildings, structures, fixtures and improvements . . . on, over and upon" the land conveyed all of Host's interest in the "Improvements only. . . . To have and to hold the Improvements, with all the rights, immunities, privileges and appurtenances thereto belonging unto Grantee [Host] and Grantee's successors and assigns, forever; so that neither the Grantor nor Grantor's heirs, successors or assigns nor any other person or persons, for Grantor or in Grantor's name or behalf, shall or will hereinafter claim or demand any right or title to the aforesaid Improvements or any part thereof, but they and each of them shall by these presents, be excluded and forever barred." Likewise, the Estoppel Certificate provided by City in conjunction with Grady's purchase of Host's interest, states: "[Host] owns the hotel on the Leased Premises. . . ."

Moreover, the 2015 Amendment contains further indicia of ownership of the Improvements by Grady. Section 508 provides that Grady "shall have the right to mortgage or otherwise encumber its interest under this Lease *without the consent* of the City." (Emphasis added.) Section 508 further provides that if requested by Grady, the City shall execute a commercially reasonable agreement with a leasehold mortgagee and "the City agrees that such agreement may, among other things . . . (3) allow the Leasehold Mortgagee to foreclose upon the interest of the Lessee under this Lease and to subsequently convey such interest to a third party *without the consent* of the City[.]" (Emphasis added.)

Although not discussed by any party, the 2007 Agreement contained provisions in which the parties agreed that if there were a taking, Grady would receive proceeds to compensate it for the value of the improvements. Those sections are set forth in Article XII, entitled "Condemnation; Eminent Domain," and were not modified by the 2015 Amendment. They provide:

> Section 1201. Total or Substantial Taking. During the term of this Agreement, if the whole, or, if such a portion of the Airport as will in the sole opinion of Lessee

materially interfere with the Lessee's conduct of its business be taken or acquired or be sold to a government under threat of such a taking(each event hereinafter called a "taking") for any public or quasi-public use or purpose under any power of eminent domain or condemnation, then, and in any such events, the term of this Agreement shall cease and terminate on the date that title vests in the condemning authority pursuant to such proceedings or under such sale in lieu thereof. Lessee shall pay all required payments apportioned to the date of such termination and shall promptly vacate the Premises. All sums representing prepaid rents, fees or charges, if any, shall be promptly repaid to the Lessee. ***All proceeds of such total or substantial taking that represent the value of the Leasehold Improvements or damage to Lessee shall be payable to Lessee and shall be its sole property.*** (Emphasis added).

Section 1202. Less than a Total or Substantial Taking. If the taking of the Premises is not the whole or not of such a portion as will materially interfere with the Lessee's conduct of its business, then the Agreement will expire as to that portion of the Premises taken but shall continue in full force and effect as to that portion of the Premises not taken. All sums representing prepaid rents, fees or charges, if any, shall be promptly repaid to the Lessee. ***All proceeds of such total or substantial taking that represent the value of the Leasehold Improvements or damage to Lessee shall be payable to Lessee and shall be its sole property***. (Emphasis added.)

These provisions provide further evidence that the City and Grady intended Grady to own the Improvements on the Property otherwise the City would not contract away its right to the proceeds as owner of the Property. "It is proper for the whole property to be valued in condemnation without regard as to who put improvements thereon or the right to remove them (which are matters to be considered when it comes to apportioning the damages between owner or lessees, ***if any right therein exists***)." *Century Elec. Co. v. Terminal R. R. Ass'n of St. Louis*, 426 S.W.2d 58, 61 (Mo. 1968) (emphasis added).

Grady cites several cases in support of its position that it has only a leasehold interest in the improvements on the basis that the title to the improvements returns to the City after the duration of the 2007 Agreement. Grady asserts that the case law concludes that the clear, determining factor as to whether a lessee owns the improvements in fee simple or has a leasehold

interest is who owns the improvements at the end of the lease. We disagree with Grady's characterization of the law.

In summary fashion, Grady cites *First National Bank of Kansas City v. Nee*, 190 F.2d 61, 67-68 (8th Cir. 1951), *Buhlinger v. United Firemen's Ins. Co. of Philadelphia*, 16 S.W.2d 699, 701 (Mo. App. 1929), *Century Elec. Co.*, 426 S.W.2d at 60-61, *In re Huffman*, 171 B.R. 649, 657 (Bankr. W.D. Mo. 1994), *Mercantile-Commerce Bank and Trust v. Mid-City Realty*, 156 S.W.2d 730, 736 (Mo. 1941), and *Goff v. Case*, 17 S.W.3d 574, 578 (Mo. App. W.D. 2000) for the conclusion that absent any language to the contrary, the lessor owns the improvements and lessee only has a leasehold interest in the improvements during the life of the lease if, pursuant to the lease, the improvements return to the lessor's ownership at the end of the lease. However, none of the cases cited are factually similar to the present case in that they do not purport to involve a lease with similar *express* provisions appropriating title of the land to the lessor and title to the improvements to the lessee as found in sections 501 and 503 of the 2007 Agreement and the 2015 Amendment. These cases all involve situations where there is no *express* provisions relating to title ownership during the lease term. The courts in these cases addressed leases that are either silent as to the ownership of the improvements at the end of the lease or provide that the improvements become the lessor's property at the end of the lease and concluding that *in the absence of language to the contrary* in either circumstance the improvements become the property of the lessor when they are erected. The express provisions governing title ownership found in sections 501 and 503 of the 2007 Agreement and the 2015 Amendment are "language to the contrary" as they *expressly* provide that Grady owns title to the Improvements, existing or installed, during the lease. Moreover, none of the cases Grady relies upon involve the ownership of an improvement already existing at the time of the lease execution.

As a matter of law, we conclude that the plain language of the 2007 Agreement and the 2015 Amendment are clear, unambiguous and evidence the City's and Grady's intent that Grady has title to the Improvements for the duration of the lease. We "give effect to the true intention of the parties by considering the language used in the lease." *K.C. Air Cargo Services, Inc. v. City of Kansas City*, 523 S.W.3d 1, 6 (Mo. App. W.D. 2017). Thus, we find the STC's decision that Grady had a leasehold interest in the improvements arbitrary, capricious and unreasonable.

Point one is denied.

### Point II[9]

In point two, Grady contends that the STC properly held that the bonus value method is the appropriate valuation of Grady's interest in the Property. In light of our determination in point one, that Grady owns the Property, the bonus value method is not the appropriate valuation method for its interest.

Section 137.115.1 requires county assessors to "annually assess all real property, including any new construction and improvements to real property, and possessory interests in real property at the percent of its true value in money[.]" "'Determining the true value in money is an issue of fact for the Commission.'" *Union Electric Co. v. Estes*, 534 S.W.3d 352, 370-71 (Mo. App. W.D. 2017) (citation omitted). However, whether the proper valuation method is used is a question of law. *Id.* "Normally, 'true value in money' is the equivalent of fair market value." *Rinehart*, 363 S.W.3d at 365. "[I]n the ordinary case, 'true value in money is the price which the property would bring from a willing buyer when offered for sale by a willing seller.'" *Id.*

Here, it is undisputed that the bonus value method used by the STC was improper as a matter of law because it only applies to leasehold interests not to ownership interests. *Frontier*

---

[9]Grady's point two is addressed by Assessor's point one and the District's point two.

*Airlines, Inc.*, 528 S.W.2d at 947 (approved bonus value method for leaseholds; bonus value is the difference between the economic rental, which is the actual market value of use and occupancy and contract rental; referred to as leasehold savings or profit), *Land Clearance for Redev. Auth. v. W.F. Coen & Co.*, 773 S.W.2d 465, 471 (Mo. App. W.D. 1989) (condemnation where tract being condemned subject to leasehold interest; proper measure of damages for lessee's interest is the bonus value of the unexpired term of the lease as measured by the difference between the market rental and the contract rental for the use and occupancy of the leasehold); *Land Clearance for Redevelopment Corp. v. Doernhoefer*, 389 S.W.2d 780, 784 (Mo. 1965) (discussion of factors to be considered in determining the market value of a leasehold). Grady does not dispute that the bonus value method only applies to valuation of a leasehold interest.

Because we have concluded that Grady does not have a leasehold interest in the Property, the bonus value method of valuation is not applicable. Thus, we find the STC decision that the bonus valuation method should be used to value Grady's interest arbitrary, capricious and unreasonable. Point two is denied.

### Points III and IV[10]

In points three and four, Grady contends that this Court does not have jurisdiction to hear Assessor's and the District's constitutional challenges to section 137.115.1 because the Court lacks jurisdiction, as only the Supreme Court can determine constitutional challenges to state revenue laws, and, in any event, section 137.115.1 does not violate article 10, section 6 or section 3 of the Missouri constitution. We need not address these points, as explained below.

The STC declined to render a decision on the constitutional challenge deeming it outside the authority of an administrative agency. At the circuit court level, it was the Assessor and District

---

[10]Grady's points three and four are addressed by Assessor's point three and the District's points four and five.

who argued that the STC's interpretation of section 137.115.1 was unconstitutional. However, the circuit court did not adopt the STC's interpretation of section 137.115.1, which thereby rendered the argument of Assessor and District moot. The circuit court therefore had no need to reach these constitutional challenges because it reversed the STC decision interpreting section 137.115.1. Likewise, in affirming the circuit court decision, we reject the STC's decision and its interpretation of section 137.115.1. Thus, we need not reach the constitutional issue.

Points three and four are denied.

## Conclusion

The STC erred in finding that Grady has a leasehold interest in the Property and in finding that the bonus value method is the appropriate valuation of Grady's interest in the Property. We affirm the judgment of the trial court which reversed the decision of the STC and remanded to the STC for reconsideration consistent with this opinion.


/s/ *W. Douglas Thomson*
W. DOUGLAS THOMSON, JUDGE

All concur.