**WORLD PUBLISHING COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

No. 16734.

United States Court of Appeals
Eighth Circuit.

Feb. 21, 1962.

Barton H. Kuhns, Omaha, Neb., made argument for the petitioner and Alexander McKie, Jr., Omaha Neb., was with him on the brief.

Fred E. Youngman, Atty., Dept. of Justice, Washington, D. C., made argument for respondent and Louis Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., were with him on the brief.

Before VOGEL, VAN OOSTERHOUT and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

This is a petition for review of a decision of the Tax Court approving the Commissioner's determination of deficiencies[1] in the taxpayer's income taxes for the respective calendar years 1952, 1953 and 1954.[2] 35 T.C. 7. The taxpayer, World Publishing Company, is a Nebraska corporation on the accrual basis. Its taxable year is the calendar year. It is engaged primarily in the newspaper business and it publishes the Omaha World Herald.

---

1. Although the deficiencies determined were attributable to several adjustments, only two of these items were contested in the Tax Court. One, concerning the deduction of fees accrued and paid in 1952 in connection with an application for a television license, is not raised in the petition for review and is not before us.

2. General code and regulations references herein will be to the Internal Revenue Code of 1954 and the Regulations issued thereunder. References to the 1939 Code and its Regulations 118 will be specifically designated.

The issue before us concerns the taxpayer's right to a deduction for depreciation of a portion of the price it paid when it purchased improved real estate subject to an outstanding lease to the tenant who had built the building on the property.

The facts are not in dispute: On June 29, 1928, George Warren Smith, Inc., was the owner of two mid-block lots in downtown Omaha. On that date Smith leased those lots to Farnam Realty Corporation. The lease was for a term of fifty years from July 1, 1928, and called for annual rentals averaging $28,500 but varying between $25,000 and $32,500 for specified decades. It required Farnam immediately to construct a "six (6) story, or more, and basement building" on the property at a cost of not less than $250,000. Farnam complied with this requirement.

On January 4, 1950, the taxpayer purchased as an investment Smith's entire interest in the property, including the lease, for $700,000. The deed recited that it was subject to the lease to Farnam. The parties have stipulated that "the remaining useful life of the building in January, 1950, was not greater than the unexpired term of the lease".

In its income tax return for each of the years in question the taxpayer asserted a deduction of $10,547.92 for "Depreciation and Amortization". This amount was determined by spreading $300,000 (constituting that part of its purchase price which the taxpayer claimed was allocable to the building) over the remaining years of the still outstanding lease. The Commissioner disallowed this deduction.[3]

Certain other provisions of the lease of June 29, 1928, from Smith, as lessor, to Farnam, as lessee, may be pertinent.

1. The parties agreed that "Any and all buildings erected on the said premises under covenants by, or permission granted, to the Lessee shall, at and upon the construction thereof, be and become a part of the realty and upon the termination of this lease, by the expiration of its term or by default or otherwise, any and all such buildings and improvements shall pass to and remain the property of the Lessor".

2. The lessee agreed to pay all taxes and assessments upon the land or the improvements or "which the Lessor shall be required to pay by reason of or on account of its interest in said land or improvements, or its interest in or under this lease, except estate, inheritance, and income taxes".

3. The lessee agreed, before beginning construction of the building, to submit all plans and specifications to the lessor for approval. The lessor could reject or amend these.

4. The lessee agreed to post security with a named Omaha bank for the construction of the building, and the lessor possessed rights, in the event of default in the construction, to call upon that security.

5. The lessee agreed at its expense to procure fire and tornado insurance for the full insurable value of the improvements, with the lessor having the right to attach any mortgage clause its mortgagee might require; to buy plate glass and explosion insurance "in such form as to furnish protection to the Lessor and Lessee"; to buy workmen's compensation insurance "for the protection of the Lessor"; and to buy upon demand "such other reasonable insurance protection as the Lessor may require". The lessee agreed to carry rental interruption insurance in its own favor.

6. The lessee agreed, in case of damage or destruction of the building or any part thereof during the lease, to repair and restore it; it was then entitled to the

insurance collected. If, however, the damage or destruction occurred on or after noon of July 1, 1958, the lessee's obligation to restore, in the absence of default in its insurance covenants, was limited to the insurance received.

7. The lessee agreed that upon the completion of the building it "shall not be altered in any manner whatsoever" without the written consent of the lessor, except by governmental authority and except that the lessee could make at its own expense alterations and improvements "in a first-class manner" without such consent if the cost did not exceed $10,-000. It was stated that it was "the intention that the building shall at all times be kept in such physical condition that excessive depreciation shall not occur".

8. The lessee agreed at its own cost to maintain the building, the premises and the fixtures in good condition and repair; to permit inspection by the lessor; and to permit the lessor to enter the premises and effect repairs when the lessee failed to keep its repair covenant.

9. The lessee agreed that the lessor could, up to a stated percentage of the ground value, borrow money on the security of the property and secure it by mortgages or deeds of trust "which shall constitute a lien on the grounds and buildings prior to the claim of the Lessee" or its assigns.

10. The lessee had the right to assign, if it was not in default, but was not thereby released from its obligations under the lease unless the lessor so consented in writing.

11. The lessee agreed that at the termination of the lease it would "surrender the possession of the demised premises to the Lessor with the buildings and improvements thereon without delay".

The taxpayer in fact has received and retained the insurance policies required

by the lease. These are issued in the name of the taxpayer as the insured.

There is substantial, and uncontradicted, evidence in the record to support the $300,000 figure. A qualified appraiser testified that at the time of purchase the fair and reasonable value of the ground alone was $400,000 and the fair and reasonable value of the building alone was around $300,000. These valuation allocations correspond, too, with the full valuations thereof used for real estate assessment purposes at the time of the purchase. The witness also testified that in his opinion the probable value of the land alone at the expiration of the lease in 1978 would be approximately $400,000.

On these facts, uninfluenced by any decided lease cases, it would seem clearly to follow that the taxpayer is entitled to a deduction, under § 167(a) [4] and under the parallel § 23(*l*) of the 1939 Code, respectively applicable to the tax years in question, for depreciation of the $300,000 portion of its 1950 purchase price allocable to the improvements on the real estate in question. See Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 101, 63 S.Ct. 902, 87 L.Ed. 1286. The building, as well as the land, was acquired and held by the taxpayer "for the production of income". The taxpayer's interest was one acquired by purchase and was not in any sense a derivative right acquired without investment on its part. By the stipulation, the building is a wasting asset and its complete exhaustion will have been effected before the end of the lease term. The taxpayer's spreading of the wasting portion of its purchase price over the entire remaining lease term by the straight-line method [5] approximated the minimal deduction for the taxpayer.

██ Furthermore, for what it may be worth, the lessor, and consequently the

---

4. "(a) General rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

"(2) of property held for the production of income."

5. § 167(b) (1); Regs. § 1.167(b)–1; Regs. 118, § 39.23(1)–5.

taxpayer, in spite of a contrary suggestion at the trial by the Commissioner's counsel, clearly owned the building in more than a bare-legal-title sense. The lease recites that all buildings erected on the premises "shall, *at and upon the construction thereof, be and become* a part of the realty and upon the termination of this lease \* \* \* shall pass to and *remain* the property of the Lessor". (Emphasis supplied.) Consistent with this are other provisions of the lease: the reference in the tax clause to the lessor's interest in the "land or improvements"; the lessor's right to amend and even reject plans and specifications for the building; the insurance protection afforded the lessor and its being named as insured; the lessor's right to subject the improvements as well as the ground to a mortgage lien; and the lessee's inability to alter the completed building beyond a $10,000 cost without the lessor's approval. Compare Bueltermann v. United States, 8 Cir., 1946, 155 F.2d 597, 598; First Nat. Bank of Kansas City v. Nee, 8 Cir., 1951, 190 F.2d 61, 68, 40 A.L.R.2d 423. This is consistent, too, with the general law, evidently recognized in Nebraska, to the effect that, unless provided otherwise by contract, a building permanently affixed to the land becomes a part of it. See Freeman v. Lynch, 8 Neb. 192; Frost v. Schinkel, 1931, 121 Neb. 784, 238 N.W. 659, 664–666, 77 A.L.R. 1381; Friedlander v. Rider, 1890, 30 Neb. 783, 47 N.W. 83, 84–85, 9 L.R.A. 700.

But the Commissioner—and the Tax Court has agreed with him—has taken the position that the taxpayer here acquired no depreciable interest in the property; that what it acquired was the land, not a wasting asset, for which it received ground rental income; that the taxpayer has not shown that it held any interest in the building for the production of income; that it acquired only such interest as its grantor Smith had; and that Smith had no depreciable interest in the lessee-constructed building. He strenuously urges, as supporting authority, a line of cases, including one of our own, concerning the situation where a taxpayer, through *inheritance* or *devise* from a deceased lessor, comes into the ownership of tenant-improved property subject to an outstanding lease: First Nat. Bank of Kansas City v. Nee, supra, 8 Cir., 1951, 190 F.2d 61, 40 A.L.R.2d 423, with Judge Collet concurring in the result; Goelet v. United States, 2 Cir., 1959, 266 F.2d 881, affirming, S.D.N.Y., 161 F.Supp. 305; Schubert v. Commissioner, 4 Cir., 1961, 286 F.2d 573, cert. den. 366 U.S. 960, 81 S.Ct. 1919, 6 L.Ed. 2d 1253, affirming 33 T.C. 1048 (2 judges dissenting); Friend v. Commissioner, 7 Cir., 1941, 119 F.2d 959, cert. den. 314 U.S. 673, 62 S.Ct. 136, 86 L.Ed. 538, affirming 40 B.T.A. 768; Commissioner of Internal Revenue v. Moore, 9 Cir., 1953, 207 F.2d 265, cert. den. 347 U.S. 942, 74 S.Ct. 637, 98 L.Ed. 1091, reversing with directions, 15 T.C. 906; Commissioner of Internal Revenue v. Pearson, 5 Cir., 1951, 188 F.2d 72, cert. den. 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648, reversing 13 T.C. 851 (5 judges dissenting); and Albert L. Rowan, 1954, 22 T.C. 865.[6] To the same effect is Rev. Rul. 55–89, 1955–1 C.B. 284.

The theories which find expression in these cases are (a) that the decedent had—and his successor has—no invest-

---

6. Prior to Rowan, the Tax Court had held directly to the contrary in three inheritance-or-devise cases. Charles Bertram Currier, 1946, 7 T.C. 980 (reviewed by the Court, one judge dissenting); J. Charles Pearson, Jr., 1949, 13 T.C. 851 (reviewed by the Court, five judges dissenting); and Mary Young Moore, 1950, 15 T.C. 906. This was on the theory that the interposition of the estate tax and the acquisition by the heir or devisee of a basis in the improvement different from the cost to the decedent (which was usually zero where the tenant constructed the improvement) equates with an investment and the taxpayer has "the gradually disappearing value of a wasting asset" which "can not be replaced except by periodic depreciation adjustments". Currier, supra, p. 984 of 7 T.C.; Pearson, supra, p. 856 of 13 T.C. The Tax Court decisions in Currier, Pearson and Moore, however, were specifically overruled in Rowan, p. 874 of 22 T.C., where the

ment in the wasting asset and (b) that the heir or devisee could acquire no different interest than was possessed by the decedent. "The major thrust of the statute is toward an allowance for recovery of investment in a wasting asset". Goelet (District Court), p. 307 of 161 F.Supp. "Appellants fail to show how a depreciable interest in the building was supplied to them * * *". Goelet (2 Cir.), p. 882 of 266 F.2d. "All she [the taxpayer] could acquire by inheritance from her mother, the testatrix, was such interest as her mother had to devise".[7] Schubert, p. 579 of 286 F.2d.

Fifth and Ninth Circuit decisions reversing Pearson and Moore were followed.

7. Seemingly contra to this last statement, however, is the statement of the Fifth Circuit in Pearson, supra, p. 74 of 188 F.2d:
   "We agree with the general view of the Tax Court that there is no necessary inconsistency in the holding that, though an ancestor, lessor, having no cost basis, does not have a depreciable interest in a building erected by a lessee, an heir may, as an incidence of estate taxation, and, under Sec. 113(a) (5), I.R.C., have a basis for depreciation and an interest to depreciate".

8. "What is the position of a taxpayer who purchases the fee interest subject to an existing lease? * * * The decisions in this area are unrealistic, and the courts' opinions are hopelessly fuzzy and confusing.
   "Let us take the simplest type of case. The taxpayer buys land and building for $150,000, with $100,000 allocable to the building. The property has an expected remaining useful life of 20 years. The entire property is subject to an outstanding lease for 5 years at a reasonable annual rent. The taxpayer would seem clearly entitled to an immediate depreciation of $5,000 per year upon his $100,-000 building cost.
   "Even this result, however, has been cast in doubt by two murky decisions, both of which involved an acquisition of the property by death, with the depreciable property constructed by the continuing lessee. Goelet v. United States, 266 F. 2d 881, aff'g 161 F.Supp. 305; Rosalie M. Schubert, 33 T.C. 1048. Although it is hard to see why a basis-at-death is less depreciable than a basis-by-purchase, it is even harder to see why a purchaser is

Are these inheritance-or-devise cases cited by the Commissioner proper or helpful precedent for a situation involving acquisition by purchase? In determining this, some comments about the death cases are perhaps in order:

A. They have provoked substantial criticism. See Rabkin and Johnson, Federal Income, Gift and Estate Taxation, Vol. 2, § 45.09(2) and (3); [8] Lurie, Depreciating Structures Bought Under Long Leases: An Adventure in Blunderland, New York University 18th Annual Institute on Federal Taxation, 1960, pp. 43, 60–62; Rubin, Depreciation of Prop-

less entitled to depreciate property constructed by a lessee than to depreciate property constructed by his vendor. The decisions appear to leave both these cases open, but they do cast a pall of doubt. * * *

"The problem is somewhat more perplexing when the remaining lease term extends beyond the expected useful life of the property. Thus, suppose that in the above example the outstanding lease had 25 years to run at the time of the purchase. In the leading case in the area, which happened to involve an acquisition by death rather than by purchase, the Ninth Circuit questionably held that the owner could not take depreciation. The opinion states that the owner's interest is not affected by the wasting of the property, because the leasehold obligation will survive the property. Com'r v. Moore, * * * There are two obvious fallacies in this rationale: (1) It is unrealistic to ignore the possibility that the lease will be broken; surely, the purchaser has paid, at least in part, for the assurance that he will have a building to lease to someone else if the present lessee defaults. (2) Depreciation, or amortization, should be allowed on the portion of the purchase price which represents the future rent attributable to the building, because that amount is the present equivalent to the lessor of his purchase price for the building. Moreover, the absurdity of the rule is demonstrated if full depreciation is allowed when the life expectancy of the building is slightly greater than the term of the lease.
"* * * Somehow the prevailing notion seems to be that the lessee's right to his own depreciation precludes any deduction for the lessor's interest in his own wasting asset".

erty Purchased Subject to a Lease, 65 Harvard Law Review, 1952, pp. 1134, 1137, 1145–1146; dissenting opinion of Judge Opper, joined by Judge Drennen, in Schubert, supra, pp. 1055, et seq., of 33 T.C. See Mertens, The Law of Federal Income Taxation, Vol. 4, § 23.90, pp. 187–188.

B. The facts of certain of these cases possess some significance. In Goelet the district court emphasized that, although the taxpayer by the terms of the lease may have had "technical legal title to the building", this was not determinative but "beneficial ownership" was. In Schubert it appears from the majority opinion of the Tax Court, p. 1049 of 33 T.C., that under the lease the improvement was to become the property of the lessor only "upon the termination of the lease". In Friend, too, it is clear from the Board's opinion, p. 771 of 40 B.T.A., that the taxpayers "did not own the buildings" and did not "even claim that they are entitled to an allowance for depreciation in respect of the buildings." In Pearson, Moore, and Nee the appellate courts all concluded that no part of the estate tax valuation, which constituted basis, was attributable to the improvements and that the taxpayer's case, depending, as it did, on a basis to depreciate, consequently failed. And in our Nee case we concluded that the rentals were attributable solely to the land; that the building was not held by the testamentary trustee for the production of income; that the tenant had the right to remove the building and replace it; and that because of this right the title to the building may have been in the lessee (the trial court had held specifically that under the terms of the lease title to the building was in the lessee: D.C., 85 F. Supp. 840, 843; D.C., 92 F.Supp. 328, 329).

C. An alternative and forceful argument made by the taxpayer in some of these cases is that he is entitled to claim a deduction for amortization of the "premium value" of the lease. The argument was rejected in Schubert (4 Cir. and Tax Court), Friend (Tax Court) and Moore (Tax Court); see Martha R. Peters, 1945, 4 T.C. 1236, 1241–1242. It prevailed, however, in Moore (9 Cir.) and necessarily by the Tax Court on remand in that case. T.C.Memo. 1955–219.[9] It was avoided in Goelet, on the ground the point was not preserved below or in the administrative proceedings, and in Frieda Bernstein, 1954, 22 T.C. 1146, 1151–1152, affirmed, 2 Cir., 230 F.2d 603, on the ground of failure of proof. Moore demonstrates, however, that one circuit has afforded relief to a taxpayer who found himself with a newly acquired interest in property with a newly acquired basis which had no rational relationship to land value alone. This alternative argument was mentioned by the Tax Court in the present case and was again rejected; it is not particularly urged by the taxpayer on this appeal.

D. The cases themselves intimate, though perhaps by indirection, that the purchase situation is distinguishable. Thus, in Friend, the Seventh Circuit, at p. 960 of 119 F.2d, describes the testamentary trustees' position there as though "they have the same right to amortize such cost as if the purchase had been made for cash" and, on p. 961 of 119 F.2d, denies a construction of the statute that would "place the petitioners in the position of a purchaser of the leaseholds [together with the reversions] for a valuable consideration". This latter observation was also quoted with approval by the Fourth Circuit in Schubert, p. 580 of 286 F.2d. In Goelet the district court, at p. 310 of 161 F.Supp., refers to the devisees' attempt to draw an analogy to purchase cases and says "An extension of these decisions to the instant case is not warranted. The crucial distinguishing factor is the payment of a purchase price or the existence of an investment, not present here, to which type

---

9. It is of interest to note that, although Moore stands opposed to Friend and Schubert on this issue, the Supreme Court has denied certiorari in all three cases.

of transaction the statute was meant to apply". When the Friend case, supra, was in the Board of Tax Appeals, the Board said, p. 771 of 40 B.T.A.:

"Clearly if a taxpayer had invested money in acquiring such right he would be entitled to deduct from the rents received each year an aliquot part of the cost of his investment; for he would be entitled under the same statute to recover back the cost of his investment, without being taxed thereon".

E. Finally, as a collateral comment on the cases, we cannot fail to observe that the depreciation provisions of the Internal Revenue Codes draw no distinction between death-acquired property and purchased property. The basis they establish for depreciation is the same as the basis for determining gain. § 167(f); §§ 23(n) and 114(a) of the 1939 Code. The only difference is as to what that basis is. §§ 1011, 1012 and 1014; §§ 113(b), 113(a) and 113(a) (5) of the 1939 Code. Once ascertained, its use, for depreciation purposes, is the same for both inherited and purchased property.

In summary, therefore, one may say of the inheritance-or-devise cases (a) that they are not without substantial criticism; (b) that many of them possess facts, particularly having to do with title and the allocation of basis to the improvement, which provide sources of difficulty and confusion; (c) that there is an alternative argument which has borne fruit in at least one circuit; (d) that the cases themselves intimate that a purchase situation may provide a different result; and (e) that the depreciation statute itself provides no basis for a distinction between the death situation and the purchase situation.

So much for these death cases. The situation before us, however, is that of a purchaser of the lessor's interest and is not that of the lessor's heir or devisee. No purchase case precisely in point has been found. We therefore start with three established propositions:

■ 1. Where an owner of land erects a building on it and then leases it he is still entitled to recover the cost of the improvement by depreciation deductions. See Helvering v. Terminal R. Ass'n of St. Louis, 8 Cir., 1937, 89 F.2d 739, 742; Alaska Realty Co. v. Commissioner, 6 Cir., 1944, 141 F.2d 675, 153 A.L.R. 901; St. Paul Union Depot Co. v. Commissioner, 8 Cir., 1941, 123 F.2d 235, 238; Regs. 1.167(a)–4.

■ 2. Where a lessee makes a capital improvement on leased property he is entitled to recover its cost by appropriate deductions for depreciation or for amortization. Regs. §§ 1.167(a)–4 and 1.162–11(b) (1); Regs. 118, § 39.23(a)–10(b); Duffy v. Central R. R. of New Jersey, 1925, 268 U.S. 55, 64, 45 S.Ct. 429, 69 L.Ed. 846; Nelson v. Commissioner, 8 Cir., 1950, 184 F.2d 649, 652.[10]

■ 3. Conversely, in the situation just described, the lessor, having no investment in the lessee's improvements, is not entitled to a deduction with respect to them. 4 Mertens, § 23.90, where possible exceptions to this rule are noted.

■ To these may be added the result reached by the death cases cited above. We think, however, that the death cases do not govern the purchase situation. We reach this result because:

A. The taxpayer-purchaser by his purchase of the property has made an investment. He is not concerned with the identity, as between his vendor-lessor and the tenant, of the builder of the building. From this point of view, if he is entitled to the deduction where his vendor-lessor was the builder, he is entitled to a deduction where the tenant was the builder.

B. To allow the purchaser to depreciate in the one situation and to deny him depreciation in the other, especially where, as here, title to the building is in the lessor and then in the purchaser,

10. Compare § 178, as added to the 1954 Code by § 15 of the Technical Amendments Act of 1958.

seems to be illogical, to emphasize a historical fact not participated in or caused by the purchaser and not of any other considered economic consequence to him, and to exhalt form over substance. This would be illustrated by identical buildings, one constructed by the lessor and one by the lessee, on adjoining identical lots, subject to otherwise identical leases, when both improved properties are sold to the taxpayer-purchaser. There seems to be no merit in allowing the taxpayer, as distinguished from the lessor, depreciation on the one but not on the other.

C. It is no answer to say that the lease rentals, averaging $28,500, constitute only ground rent. We are concerned here not with depreciation of rentals, but with depreciation of a portion of this taxpayer's investment in the income producing property he purchased.

D. Whatever may be the proper result in the inheritance or devise situation, as exemplified by our 1951 holding in the Nee case, and by the other cases cited above, we are not now willing to extend the philosophy of those cases to the purchase situation of the present litigation.

We regard Millinery Center Building Corporation v. Commissioner, 2 Cir., 1955, 221 F.2d 322, as of particular and helpful significance here. That taxpayer had leased land with an option to renew and; in accordance with the lease, had erected a substantial building on it. Title to the building was in the taxpayer but under the lease it would vest in the lessor at the end of the lease term or the lessor could then compel the taxpayer to remove it. During the lease period the taxpayer fully depreciated the cost of the building. Then it exercised its option to renew. When this was done, it bought the fee. The taxpayer sought to deduct the difference between its purchase price and the then value of the land, as unimproved, as a business expense. The Tax Court disallowed this; it also refused to accept the taxpayer's alternative contentions (a) that the difference should be amortized over the lease term and (b) that it should be de-

preciated over the remaining useful life of the building. 21 T.C. 817. Six judges dissented on the ground that some part of the purchase price should be allocated to the additional rights the taxpayer acquired in the building and should be recovered through depreciation. On petition for review the Second Circuit reversed on the depreciation issue. It said, p. 324 of 221 F.2d, "A third-party purchaser of such a fee would be entitled to allocate part of its cost to the building and to depreciate it as such". On the taxpayer's petition for certiorari the Supreme Court affirmed. 350 U.S. 456, 76 S.Ct. 493, 100 L.Ed. 545. The Commissioner did not seek review of the allowance of depreciation.

The taxpayer there occupied a position similar to that of the taxpayer here. The only fact differences were the taxpayer's additional posture as lessee and the lease's consequent extinguishment upon the purchase. These differences seem to us, however, of minor import.

That Farnam may have been taking depreciation with respect to its cost in the building need not concern us. Its right so to do is not here at issue. Despite the Ninth Circuit's observation, by way of dictum in the Moore case, p. 272 of 207 F.2d, that "A construction of the law to permit not only the lessee (who has a real economic interest) but also the taxpayer here to take depreciation on the same building would be somewhat anomalous", we fail to see the anomaly. What is significant is that each taxpayer has a separate wasting investment which meets the statutory requirements for depreciation. To allow each to recover his own, and separate, investment is not, as is suggested, to permit duplication at the expense of the revenues and is not to permit one taxpayer to depreciate another's investment. That each is concerned with the same building is of no relevance. Farnam has its lessee's cost of the structure and the present taxpayer has the portion of its purchase price attributable to the building. If two taxpayers own undivided interests in improved real estate, each may be entitled

to depreciation. The situation here is not dissimilar.

This leaves only the question of proof. We could remand the case with instructions to the Tax Court to take further evidence as to that portion of the taxpayer's purchase price which was properly allocable to the building as distinguished from the land. We feel, however, that on this record the taxpayer has sufficiently established his $300,000 allocation. The Commissioner had his opportunity in the proceedings which have already taken place in the Tax Court to controvert the taxpayer's evidence. This he did not do but chose, instead, to rely on his basic thesis that the taxpayer had no investment which was entitled to depreciation.

The decision of the Tax Court is reversed with directions to recompute the taxpayer's deficiencies in accord with the views herein expressed.