GENEVA DRIVE-IN THEATRE, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8401–73, 8402–73, 8407–73. Filed January 31, 1977.

---

[1] The following cases are consolidated herewith: Las Vegas Theatrical Corp., docket

*Elliot G. Steinberg, Richard C. Schwartz, Randall G. Dick,* and *Lucinda Lee,* for the petitioners.
*William E. Saul,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Tax year ended | Deficiency |
|---|---|---|
| Geneva Drive-In Theatre, Inc | June 30, 1968 | $4,190 |
| | June 30, 1969 | 5,465 |
| | June 30, 1970 | 5,458 |
| | June 30, 1971 | 639 |
| Las Vegas Theatrical Corp | Mar. 31, 1971 | 645 |
| Concord Theatre Co | Mar. 31, 1968 | 5,244 |
| | Mar. 31, 1969 | 3,072 |
| | Mar. 31, 1970 | 2,530 |
| | Mar. 31, 1971 | 3,712 |

The only issue for our decision is whether petitioners are entitled under section 167(a)[2] to depreciation deductions in respect of certain improvements erected or installed by the lessee of property acquired by petitioners subject to an outstanding lease.

### FINDINGS OF FACT

Petitioners Geneva Drive-In Theatre, Inc. (hereinafter Geneva), Concord Theatre Co. (hereinafter Concord), and Las Vegas Theatrical Corp. (hereinafter Las Vegas) had their principal offices in San Francisco, Calif., on the date their petitions were filed. Geneva timely filed corporation income

---

No. 8402–73; Concord Theatre Co., docket No. 8407–73.

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

tax returns for the fiscal years ended June 30, 1968, June 30, 1969, June 30, 1970, and June 30, 1971, with the Internal Revenue Service Center at Ogden, Utah. Concord timely filed a corporation income tax return for the fiscal year ended March 31, 1968, with the District Director of Internal Revenue at San Francisco, Calif., and for the fiscal years ended March 31, 1969, March 31, 1970, and March 31, 1971, with the Internal Revenue Service Center at Ogden, Utah. Las Vegas timely filed a corporation income tax return for the fiscal year ended March 31, 1971, with the same Internal Revenue Service Center.

On March 3, 1950, John Huston (hereinafter Huston), owner of two parcels of unimproved real property in Alameda, Calif., leased those two parcels to Alameda Drive-In Theatre, a copartnership, composed of Phillip F. Hearty, Inc., a corporation, and Garmon Development Co., a corporation. Thereafter, Alameda Drive-In Theatre changed its name to Island Auto Movie, and for convenience the lessee in the lease agreement with Huston will be referred to as Island.

As a condition of the lease, Island was required to erect improvements so that the leased property could be operated as a drive-in theater. The lease provided that the "Lessee shall complete the erection and installation of such drive-in theatre by midnight on September 30, 1950." Island complied with the lease and erected theater improvements on the property. The lease expired on March 2, 1970.

Pursuant to the lease, the lessee was to insure the buildings and improvements against loss or damage. The proceeds from such insurance policies were to be available to the lessee to restore the insured property to its condition immediately preceding the loss. Should the insurance proceeds be insufficient to make needed repairs or construct new buildings or improvements, then the lessee was to provide the balance of the necessary funds. The lease provided that upon expiration or termination of the lease, for any reason, all buildings and improvements of any kind constructed by the lessee on the property would vest in the lessor as "absolute owner."

On April 9, 1965, Leslie M. Kessler and Albert H. Kessler, acting on behalf of Concord, and Raymond J. Syufy, acting on behalf of Geneva, purchased from Huston the two parcels of land leased to Island and two adjoining parcels for $400,000.

On June 17, 1965, an agreement was entered into between the owners of Concord and Raymond Syufy and Syufy Enterprises, acting for Geneva, to acquire the title to the four parcels of real estate and the improvements thereon. Concord and Syufy Enterprises, acting for Geneva, were each to acquire an undivided one-half interest in such parcels. A one-half undivided interest in the title to the four parcels and the improvements thereon, originally taken in the name of Concord, was thereafter transferred to Geneva by a corporation grant deed dated July 6, 1965.

Geneva and Concord incurred expenses in the amount of $4,907 in acquiring the property from Huston. Upon acquisition of the property, Concord and Geneva formed a California general partnership known as Alameda Properties Joint Venture (hereinafter Alameda) which had its principal office in San Francisco, Calif. Alameda later changed its name to Island Auto Movies Co. (Island Auto).

In 1970, Las Vegas became a general partner in Island Auto with Geneva and Concord by purchasing a fractional interest from Geneva. Island Auto timely filed a 1970 United States Partnership Return of Income with the Internal Revenue Service Center at Fresno, Calif.

Alameda originally allocated $165,000 of the $404,907 purchase price (including expenses) paid in 1965 to the land and the remaining $239,907 was allocated to the following assets:

|  | Percent of purchase price | Basis |
|---|---|---|
| Snack bar building | 10.970 | $26,000 |
| Paving | 27.004 | 64,000 |
| Underground drain | 5.063 | 12,000 |
| Electrical wiring | 13.713 | 32,500 |
| Speaker poles | 1.055 | 2,500 |
| Fence | 2.532 | 6,000 |
| Marquee | 2.110 | 5,000 |
| Marquee letters | .633 | 1,500 |
| Projection of sound equipment | 10.127 | 24,000 |
| Speakers and projection boxes | 5.063 | 12,000 |
| Miscellaneous equipment | 10.549 | 25,000 |
| Screen tower | 5.063 | 12,000 |

| | | |
|---|---|---|
| Playground equipment | .422 | 1,000 |
| Ticket and vending machines | 1.266 | 3,000 |
| Subrental building | 3.164 | 7,500 |
| Box office building | 1.266 | 3,000 |
| | 100.000 | 237,000 |

The parties have agreed to adjust the allocation of the purchase price and expenses to attribute $204,847 to the land.

When petitioners purchased the property in 1965, the anticipated useful life of the improvements exceeded the term of the lease. Alameda claimed depreciation on the assets and improvements acquired from Huston commencing in 1965, using a 9-year composite useful life.

In his notice of deficiency, respondent disallowed petitioners' claimed deductions for depreciation on the leasehold improvements for the taxable years 1967 through 1969 as follows:

On July 2, 1965, the partnership Island Auto Movies Co. (formerly Alemeda [sic] Properties Joint Venture) acquired land and a lease thereon at a cost of $404,907.00. This lump sum amount was allocated as follows: land $165,000.00 and 16 types of depreciable assets $239,907.00. Depreciation thereafter was claimed on the latter amount using a 9 year composite life. The 16 types of depreciable assets consisted of leasehold improvements and personal property previously erected or acquired by the lessee for use in his business. Under the terms of the lease the lessee was required on March 2, 1970, to surrender possession to those assets as well as the land.

It is determined (1) that $204,847.00 represents the value of the land as previously agreed upon (2) that the remainder of $200,060.00 represents the value of the right under the lease to acquire the 16 types of depreciable assets on March 2, 1970, and no depreciation is allowable thereon until that event occurred. * * *

### OPINION

Section 167(a)[3] permits the deduction of a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property which is (1) used in the taxpayer's trade or business or (2) held for the production of income. To qualify

---

[3] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

   (1) of property used in the trade or business, or
   (2) of property held for the production of income.

for this deduction the taxpayer has the burden of proving that he has a depreciable interest in the property in the sense that he has made an investment in it and will suffer the economic loss resulting from its deterioration through obsolescence or use. See *Barnes v. United States*, 222 F.Supp. 960, 962 (D. Mass. 1963), affd. sub nom. *Buzzell v. United States*, 326 F.2d 825 (1st Cir. 1964), and cases cited therein. The allowance is intended "to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." *Detroit Edison Co. v. United States*, 319 U.S. 98, 101 (1943).

Accordingly, in the instant case, when Huston on March 3, 1950, leased his unimproved real property to Island for 20 years and Island erected or installed the drive-in theater facilities at its cost, Island, as lessee, became entitled to deductions for depreciation of the property items comprising the installation. Sec. 1.167(a)–4,[4] Income Tax Regs. Island made the capital outlay for the construction and installation of such items, and they were used in its business. The depreciation deductions enabled Island to recover, tax wise, the economic loss it suffered as a result of the deterioration of the improvements through use or obsolescence. Huston was not entitled to depreciate the facilities because he made no investment and had no depreciable interest in them. They were not used in his trade or business or held for the production of income. The rent which he received compensated him only for the use of the land, a nondepreciable asset.

The crucial issue is whether, despite the fact that Huston was not entitled to depreciation deductions in respect of the theater installation, petitioners qualified for such deductions

---

[4] The rule is succinctly stated in sec. 1.167(a)–4, Income Tax Regs., in part as follows:

Capital expenditures made by a lessee for the erection of buildings or the construction of other permanent improvements on leased property are recoverable through allowances for depreciation or amortization. If the useful life of such improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, the allowances shall take the form of depreciation under section 167. * * * If, on the other hand, the estimated useful life of such property in the hands of the taxpayer, determined without regard to the terms of the lease, would be longer than the remaining period of such lease, the allowances shall take the form of annual deductions from gross income in an amount equal to the unrecovered cost of such capital expenditures divided by the number of years remaining of the term of the lease. * * *

immediately upon their 1965 purchase of Huston's interest. We hold they did not. However, petitioners may recover through depreciation deductions beginning March 2, 1970, the date the lease terminated, their $200,000 investment in excess of the amount paid for the purchased land. The depreciation allowance in respect of this $200,000 investment will be spread over the useful life of the theater facilities remaining after that date.

When petitioners bought Huston's interest in the land and improvements in 1965, he conveyed to them the property subject to the lease. Petitioners acquired only such rights as Huston had: (1) Legal title to the land, subject to the lease; (2) the right to receive the rent prescribed by the lease for the use of the land; and (3) the right to have the land and theater improvements revert to them, as provided in the lease, upon its termination. Other than this reversionary interest, petitioners acquired no present interest in the theater improvements.

The land is not a depreciable asset, and petitioners have not shown that they paid any premium for the assignment of the lease which would entitle them to amortization deductions for the remainder of its term. Compare *Schubert v. Commissioner*, 286 F.2d 573, 580–583 (4th Cir. 1961), affg. 33 T.C. 1048 (1960), cert. denied 366 U.S. 960 (1961); *Commissioner v. Moore*, 207 F.2d 265, 277 (9th Cir. 1953), revg. and remanding 15 T.C. 906 (1950), cert. denied 347 U.S. 942 (1954). Indeed, the evidence is to the contrary.[5] Clearly, therefore, petitioners are not entitled to depreciation or amortization deductions in respect of either the land or the lease as such.

Nor are petitioners entitled to depreciation deductions in respect of the theater improvements until after the expiration of the lease term. Prior thereto, petitioners' interest in the improvements was not used by them in their business. The improvements could produce no income for petitioners until the lease terminated and their interest ripened into owner-

---

[5] The parties have stipulated that, of the $404,907 purchase price, $204,847 was allocable to the land and the remainder to the improvements. The existence of the lease was regarded as unimportant. Raymond Syufy, who participated in the negotiation of petitioners' purchase, testified:

Q. Did you consider the lease that these properties were subject to?

A. No, the lease wasn't considered at all. I didn't care about the lease.

ship of the improvements. Their interest in the improvements did not diminish in value as a result of the passage of time but, instead, increased in value as the time for the actual enjoyment of the improvements approached. See *Goelet v. United States,* 161 F.Supp. 305, 310 (S.D. N.Y. 1958), affd. 266 F.2d 881 (2d Cir. 1959).

The improvements may have deteriorated in value as they were used in Island's business between the date of petitioners' 1965 acquisition and the lease termination on March 2, 1970, but petitioners did not suffer any economic loss as a result of that deterioration. The purchase price petitioners paid Huston no doubt took into account the facts that, under the lease, the theater improvements would not become petitioners' property until the lease terminated and that petitioners would receive them in their deteriorated condition as of the lease termination date.[6] Petitioners paid nothing for any substantial immediate interest in the improvements and acquired none other than the reversionary interest.[7]

We think it quite clear that petitioners' reversionary interest in the theater improvements was not a depreciable one. See *M. DeMatteo Construction Co. v. United States,* 433 F.2d 1263, 1265 (1st Cir. 1970); *Schubert v. Commissioner, supra* at 578–580; *Commissioner v. Moore, supra* at 269; *Goelet v. United States, supra* at 309–310. Upon the termination of the lease on March 2, 1970, when the theater improvements reverted to petitioners, their interest ripened into a depreciable one. They then became entitled to annual depreciation deductions in such amounts as to enable them to recover over

---

[6] The Mar. 3, 1950, lease provided:

Lessee will * * * surrender, yield up and deliver to Lessor the possession of the said real property, together with the buildings, improvements and appurtenances thereunto belonging, and the items specified * * *, in as good condition as when the same were constructed by Lessee, ordinary wear and tear thereof excepted.

It is clear, therefore, that whatever depreciation occurred between 1965 and 1970 was suffered by the lessee.

[7] Petitioners' position is similar in many respects to that of a purchaser of depreciable property under an executory contract of sale. In such situations, even though the property may deteriorate during the period between the contract and delivery dates, the purchaser is entitled to no depreciation deductions until the contract is fully executed and the purchaser has taken possession and assumed the burdens of ownership. See *Charles C. Hanson,* 23 B.T.A. 590, 604 (1931); Rev. Rul. 69–89, 1969–1 C.B. 59; Rev. Rul. 68–431, 1968–2 C.B. 99.

the improvements' remaining useful lives the $200,000 of the purchase price allocable to them.

There may be situations where lessee-constructed improvements enhance the value of real property acquired subject to a lease. Such improvements, for example, may provide added assurance that the land rent to which the purchaser becomes entitled will be collectible. In that sense the deterioration or obsolescence of the improvements prior to the expiration of the lease may tend to cause the purchaser's investment to depreciate. In the final analysis, however, the existence of improvements in such circumstances adds value to the lease which produces income to the purchaser, and in appropriate cases the courts have indicated that the premium value of the lease is amortizable. See *Commissioner v. Moore, supra* at 277; *Schubert v. Commissioner, supra* at 580–583. On the other hand, in other cases, where the purchaser may be required to remove or rebuild deteriorated or obsolete structures, their existence may be a negative factor in the purchase. Careful attention, therefore, must be given to the facts of the individual case.

The evidence is explicit in the instant case that the improvements had value beyond the lease term. The purchasers were not interested in acquiring the lease as an investment. This is clear from the fact that none of the purchase price was allocated to the leasehold interest itself. In return for their disputed investment, petitioners acquired only a reversionary interest in the improvements which would ripen into ownership and the right to possession only upon the termination of the lease. Not until then would petitioners be able to use the improvements in their business or hold them for the production of income, and not until then would they suffer any loss as a result of the depreciation or obsolescence of these improvements.

Petitioners' reliance on *World Publishing Co. v. Commissioner,* 299 F.2d 614 (8th Cir. 1962), revg. 35 T.C. 7 (1960), is misplaced. In that case the taxpayer purchased for $700,000 an improved lot subject to a 50-year lease having 28 years to run. The unimproved land was appraised at $400,000 and a building erected by the tenant at the outset of the lease was appraised at $300,000. It was stipulated that the building would be without value by the time the lease expired. The

court was faced with the issue as to how the taxpayer would be permitted to recover the $300,000 investment in excess of the land value. The court allowed the $300,000 to be deducted ratably over the remaining years of the lease.[8]

The *World Publishing Co.* opinion holds that the $300,000 was amortizable as a premium paid by the taxpayer for the favorable aspects of the lease and not as depreciation of the building. It is almost inconceivable that the taxpayer in that case would have paid $300,000 for a building which, as such, would provide it with no income and would have no value when the lease was terminated. In fact, the opinion enumerates 11 provisions of the lease which, in addition to rentals averaging $28,000 per year over the remaining 28 years of the lease term, conferred various benefits and rights upon the lessor and, as a result of the purchase, upon the taxpayer. While portions of the opinion could be interpreted to refer to the building as a wasting asset, the holding was (299 F.2d at 617) that: "The taxpayer's spreading of the wasting portion of its purchase price over the entire remaining lease term by the straight-line method approximated the minimal deduction for the taxpayer." Had the court intended to hold, as petitioners here maintain, that the taxpayer-purchaser was entitled to depreciate the building as such, the depreciable period would have been keyed to the remaining useful life of the building rather than the unexpired portion of the lease term.[9] In the instant case, petitioners make no claim to a right to amortize the lease over its remaining term and the opinion, therefore, is not apposite.

Even if petitioners are correct in their position that the *World Publishing Co.* opinion was intended to allow depreciation on the building as such, the case is nonetheless

---

[8] The opinion is discussed in Note, 76 Harv. L. Rev. 1303 (1963); see also analyses of the opinion in Quilliam, "Depreciation of Property Acquired Subject to a Lease: Premium Lease Rentals as a Wasting Asset," 4 Valparaiso U. L. Rev. 261 (1969); Note, 23 Md. L. Rev. 353 (1963); *M. DeMatteo Construction Co. v. United States*, 433 F.2d 1263, 1265 (1st Cir. 1970). The opinion does not indicate that either party suggested that the $300,000 was allocable to the basis for the land on the theory the purchase was a bad bargain. Quite obviously, the reversionary interest in the building was without value.

[9] The court pointed out that under Nebraska law the taxpayer as purchaser of the land acquired legal title to the building. However, the location of the legal title does not govern the right to depreciation deductions. *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939); *First Nat. Bank of Kansas City v. Nee*, 190 F.2d 61, 68 (8th Cir. 1951).

distinguishable from the instant one. The *World Publishing Co.* lease permitted the lessor, up to a stated percentage of the ground value, to borrow money on the security of the property and the lien securing the loan would be prior to the claim of the lessee. Also, the lessor had the right to attach any mortgage clause the lessor's mortgagee might require in the insurance policies maintained by the lessee. These and other rights acquired by the taxpayer under the purchase agreement may be said to constitute a present interest in the building. Such rights far exceed the rights petitioners acquired in the theater improvements in the instant case, and the case is distinguishable from the instant one on that ground.

Nor does either *Millinery Corp. v. Commissioner,* 350 U.S. 456 (1956), or *Wilshire Medical Properties, Inc. v. United States,* 314 F.2d 333 (9th Cir. 1963),[10] aid petitioners. In those cases, the taxpayers had rented vacant land under long-term leases, constructed buildings on such land, and depreciated the buildings. They then acquired the fee interest before the useful lives of the buildings expired, and the courts held that the purchases gave the taxpayers new bases in the buildings to the extent that the amounts paid were allocable to the buildings. Such amounts were recoverable through depreciation deductions. The case *Wagner v. Commissioner,* 518 F.2d 655 (10th Cir. 1975), relied upon by petitioners, is likewise distinguishable on its facts.

One other argument is advanced, but not clearly articulated, by petitioners. The notice of deficiency determines that the portion of the purchase price not allocable to the value of the land acquired by petitioners on July 2, 1965, "represents the value of the right under the lease to acquire the 16 types of depreciable assets on March 2, 1970." Petitioners argue that, if they purchased a right to acquire assets, such right was an intangible asset which expired with the termination of the lease, and they are entitled to amortize its cost over the unexpired portion of the lease term as of the date of the purchase, citing section 1.167(a)–3, Income Tax Regs.

---

[10] The facts stated in *Wilshire Medical Properties, Inc. v. United States,* 314 F.2d 333 (9th Cir. 1963), are abbreviated but are more fully stated in the District Court's unreported opinion (S.D. Cal. 1961, 7 AFTR 2d 1412, 61–1 USTC par. 9446).

We find no merit in this argument. We interpret the notice of deficiency to refer to the right which petitioners acquired to have the theater improvements revert to them as purchasers from the lessor upon the expiration of the lease. This right did not decrease in value as a result of the passage of time. Rather, as pointed out above, it increased in value as the time for the actual enjoyment of the improvements approached. Indeed, petitioners' own witness testified that the theater improvements were considerably more valuable in 1970 than the amount petitioners paid for them in 1965.[11]

To reflect the foregoing and the disposition of other issues,

*Decisions will be entered under Rule 155.*

---

[11] Petitioners' witness testified as follows:

Q. Could you have purchased this property, this same property in 1970 for the same price that you paid in 1965?

A. No, sir. It would have been considerably more.

Q. In your opinion how much could the property have been sold for in 1970?

A. Probably 50 percent more.